In re A.H. ROBINS COMPANY, INCORPORATED, Debtor.

DALKON SHIELD CLAIMANTS' COMMITTEE, in its own right and on Behalf of A.H. Robins Company, Incorporated, Plaintiff,

v.

The AETNA CASUALTY AND SURETY CO., Defendant.

Glenda BRELAND, et al., Plaintiffs,

v.

AETNA CASUALTY AND SURETY COMPANY, Defendant.

Bankruptcy No. 85–01307–R.

Adv. No. 87–1006–R.

Civ. A. No. 87–0315–R.

United States District Court,
E.D. Virginia,
Richmond Division.

April 12, 1988.

John J. Walsh, Mark C. Ellenberg, Peter M. Dodson, Cadwalader, Wickersham & Taft, Washington, D.C., for Dalkon Shield Claimants' Committee.

A. Peter Brodell, W. Scott Street, III, Williams, Mullen, Christian & Dobbins, Richmond, Va., for Aetna Cas. & Sur. Co.

Joseph S. Friedberg, Minneapolis, Minn., Ronald I. Meshbesher, Paul W. Bergstrom, Meshbesher, Singer & Spence, John A. Cochrane, Cochrane & Bresnahan, St. Paul, Minn., Herbert B. Newberg, Philadelphia, Pa., Martin J. D'Urso, Lansdowne, Pa., James Hovland, Krause & Rollins, Minneapolis, Minn., Douglas W. Thomson, Thomson, Hawkins & Ellis, St. Paul, Minn., Murray Janus, Theodore I. Brenner, Bremner, Baber & Janus, Richmond, Va., for Breland et al.

## MEMORANDUM

MERHIGE, District Judge.

This matter is before the Court on motions to certify a mandatory plaintiff class. The *Breland* action was brought against the Debtor's insurance carrier Aetna Casualty and Surety Co. ("Aetna") by claimants alleging injuries from the product and conduct of the Debtor and Aetna. The paramount issue is the propriety of certifying mandatory or opt-out classes with respect to compensatory and punitive damages.

*Procedural Background*

Commencing in the 1970's, A.H. Robins Company, Incorporated (the "Debtor" or "Robins") manufactured an intrauterine contraceptive device known as the Dalkon Shield. Plaintiffs, in what has come to be known as the *"Breland"* action, are seven female Dalkon Shield claimants who allege injuries caused by the Dalkon Shield. *Breland* plaintiffs sue in their individual capacity and as representatives[1] of all other persons who claim damages, injuries, or potential injuries arising from the use of the Dalkon Shield.

---

1. By Order dated December 29, 1986, entered in *Breland v. Aetna Casualty & Surety Co.*, CA No. 86–0315–R, the Court conditionally certified a class "subject to further consideration ... [as to] whether this action should continue to be maintained as a class action, and if so, in what form."

Plaintiffs seek compensatory and punitive damages against the Debtor's insurer on theories of negligence, strict product liability, conspiracy, RICO, and an "insurance conspiracy" relating to the conduct of Aetna in connection with its providing products liability insurance to Robins. In addition, the complaint alleges, on behalf of the class, that Robins and Aetna improperly settled litigation instituted by Robins relating to the meaning and scope of Aetna's product liability insurance ("the coverage litigation"), and that the settlement and releases between Aetna and Robins in 1984 in the coverage litigation should be set aside.

Subsequent to institution of the *Breland* action, the Official Dalkon Shield Claimants' Committee (the "Committee") filed, by leave of court, on August 19, 1987, an adversary proceeding in its own right and on behalf of A.H. Robins Company, Inc. This complaint seeks judgment against Aetna for (a) contribution for all or part of any damages paid to Dalkon Shield claimants by Robins, in an amount to be determined at trial, with interest thereon, as well as defense costs, including legal fees and administrative expenses; (b) for contribution for all or part of any future damages to be paid to Dalkon shield claimants by Robins, in an amount to be determined at trial, with interest thereon, as well as defense costs, including legal fees and administrative expenses; and (c) for such other and further relief as the Court deemed just and proper.

Aetna in turn, though denying any liability, filed a counterclaim against Robins. Aetna alleges that, in the event that Aetna is liable to Robins for contribution or for other form of relief, then, as to any amounts which Aetna is required to pay to Dalkon Shield claimants (other than under the policies of insurance issued by Aetna to Robins) on account of injuries related to the Dalkon Shield, Robins is liable to Aetna for contribution as to all such payments.

On September 4, 1987, the Committee's adversary proceeding was stayed, and on October 15, 1987 that proceeding and the *Breland* action were consolidated pursuant to Fed.R.Civ.P. 42(a) and Bankruptcy Rule 7042.[2]

The obvious goal of the Committee in bringing the adversary proceeding was the enhancement of any Dalkon Shield fund which might be available for the benefit of its constituency. Its claim, as a practical matter, is duplicative of the *Breland* action in its objective and in the issues raised. On October 20, 1986, the Committee unsuccessfully sought leave to intervene as plaintiffs in the *Breland* action and in support of its motion contended, as the Court now agrees, that:

The claims asserted against Aetna in the Breland Action seek to compensate Dalkon Shield Claimants for alleged damages caused directly or indirectly by the Dalkon Shield. Such claims arise from Robins' manufacture, sale and distribution of the Dalkon Shield and from the handling of claims asserted against Robins arising out of same. Such claims against Aetna are derivative of and factually intertwined with the allegations, theories of liability and claims which have previously been asserted against Robins and E. Claiborne Robins, Sr., Hugh J. Davis and E. Claiborne Robins, Jr., each of whom is named as a co-conspirator in the Breland Action.

As a practical matter, to the extent the Breland Action is permitted to proceed against Aetna, Robins will be required to participate in any discovery conducted therein and in any trial thereof because much of the evidence and documentation relevant to the claims asserted therein is in Robins' possession. Testimony of Robins' officers, directors, employees, agents and attorneys would be required by continued prosecution of the Breland Action.

The claims asserted against Aetna in the Breland action also implicate certain liability insurance policies issued by Aet-

---

**2.** It is to be noted that Bankruptcy Rule 7023 provides that Fed.R.Civ.P. 23 applies in adversary proceedings, while Bankruptcy Rule 9014 allows the application of Rule 7023 to "any stage" in contested matters. *See In re American Reserve Corp.,* 840 F.2d 487 (7th Cir.1988).

na to Robins (the "Aetna Policies"). The continued prosecution of the Breland Action would therefore potentially affect assets of Robins' estate and would require Robins' participation to protect the estate's interests against adverse findings with respect to the Aetna Policies.

The Court in its stay order of September 4, *supra*, had directed that the "stay be clarified so as not to prohibit discussions on all relevant issues in these consolidated cases." On February 4, 1988, the Court, to permit negotiations in this litigation to proceed parallel to and in conjunction with the negotiations for a consensual plan of reorganization, lifted the stay previously imposed in the *Breland* matter.

The record reflects that a number of parties sought leave to intervene in the *Breland* action, most for purposes of opposing a class certification. The Court granted intervention for that limited purpose.

*History of the Bankruptcy Reorganization Case*

The history of this massive bankruptcy case has been generally set out by the United States Court of Appeals for the Fourth Circuit in at least ten opinions deciding twenty appeals.[3] Nevertheless, a summary of the background of the case may be of assistance in considering the Court's ultimate conclusion on the instant issue.

Aetna was the Debtor's product liability insurer with an obligation to defend Robins against Dalkon Shield claims manifesting during the period of the coverage, 1970–1978.[4]

The Dalkon Shield had been distributed not only in the United States, but in approximately 100 foreign countries. Within a few years after its initial distribution of Dalkon Shields, the Debtor was faced with a large number of personal injury claims. By the time it sought protection under Chapter 11, over 15,000 claims had been made and over 6,000 lawsuits in federal and state courts were still pending. Lawsuits had been instituted in literally every state of the country. Several large judgments for punitive damages had been awarded against Robins, and, at least one, at the time of the institution of the Chapter 11 case, was unsatisfied and on appeal. By the middle of August, 1985, the Debtor and its insurance carrier had expended more than $500,000,000.00 in defense, satisfaction and settlement of thousands of claims.

In August 1985, with its insurance limits nearly exhausted and the expenses of litigation continuing to increase, Robins filed a petition for reorganization under Chapter 11 of the Bankruptcy Code in this Court. The petition sought both time for Robins to reorganize its affairs in the face of massive, complex litigation, and to seek a means for providing full compensation, if possible, to those who could demonstrate injury from the use of its product.

The Court, in a procedure approved by its Court of Appeals,[5] directed Robins to give world-wide notice of its bankruptcy proceedings and to encourage potential claimants, both present and future, to file claims by mailing a written document containing their names and addresses. As a consequence, over 300,000 persons filed the required document.

---

**3.** *Maressa v. A.H. Robins Co.*, 839 F.2d 220 (4th Cir.1988); *Grady v. A.H. Robins Co.*, 839 F.2d 198 (4th Cir.1988); *Official Committee of Equity Security Holders v. Mabey, Examiner*, 832 F.2d 299 (4th Cir.1987); *cert. denied,* ––– U.S. –––, 108 S.Ct. 1228, 99 L.Ed.2d 428 (1988); *Beard v. A.H. Robins Co.*, 828 F.2d 1029 (4th Cir.1987); *Committee of Dalkon Shield Claimants v. A.H. Robins Co.*, 828 F.2d 239 (4th Cir.1987); *Oberg v. Aetna Casualty & Surety Co.*, 828 F.2d 1023 (4th Cir.1987), *cert. denied,* ––– U.S. –––, 108 S.Ct. 1246, 99 L.Ed.2d 444 (1988), *Van Arsdale v. Clemo*, 825 F.2d 794 (4th Cir.1987); *Vancouver Women's Health Collective Society v. A.H. Robins*

*Co.*, 820 F.2d 1359 (4th Cir.1987); *In re: Diana R. Beard*, 811 F.2d 818 (4th Cir.1987); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986), *cert. denied,* ––– U.S. –––, 107 S.Ct. 251, 93 L.Ed.2d 177 (1987).

**4.** Robins discontinued the manufacture and sale of the Dalkon Shield in 1974.

**5.** *See Vancouver Women's Health Collective Society v. A.H. Robins Co.*, 820 F.2d 1359 (4th Cir.1987).

These filings initiated a massive task, joined in by the official committees appointed by the Court, of establishing procedures for determining which claims would be eligible for consideration of compensatory payments under the Debtor's anticipated Plan of Reorganization. The result of the implemented procedures established that there were approximately 200,000 claims to be considered in the contemplated reorganization.

Aetna asserts that it had been named in approximately 140 complaints throughout the United States alleging facts and theories substantially similar to those alleged in the *Breland* action. Prior to the stay of proceedings occasioned by the filing of the petition for reorganization and a subsequent preliminary injunction entered by this Court staying continuation of "related" claims, approximately 40 cases against Aetna had been dismissed. In every case in which the dismissal was involuntary, a ruling was obtained by Aetna that the complaint failed to state a claim against Aetna.[6]

In the course of the reorganization proceedings, numerous claimants sought to hold Aetna jointly liable with Robins (and sought as well, to hold other persons or entities jointly liable with Robins) for Dalkon Shield injuries. The Court preliminarily enjoined the continued prosecution of such actions for, among other reasons, the adverse effect it would have upon Robins and its continuing effort to reorganize. The preliminary injunction was upheld in *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994 (4th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 251, 93 L.Ed.2d 177 (1987) and *Oberg v. Aetna Casualty & Surety Co.*, 828 F.2d 1023 (4th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1246, 99 L.Ed.2d 444 (1988). As to the suits against Aetna, for example, it was recognized that Aetna's defense would be premised, in part, upon the conduct of Robins and that Robins, even if not named as a party, inevitably would be drawn into any such litigation, both during discovery and at trial. The Fourth Circuit acknowledged that litigation against Aetna, even where the insurance proceeds which constitutes the property of Robins was not involved and Robins was not named, nevertheless would inevitably interfere with the reorganization effort of Robins. *Oberg*, 828 F.2d at 1026.

In addition to the threat posed to Robins by litigation against Aetna, Aetna is intertwined in the Robins reorganization proceeding in two other significant ways. First, Aetna filed a substantial proof of claim relating to issues involving the amount and availability of remaining insurance coverage, an important asset of the estate. And second, as the Court has heretofore made reference, the Committee sought contribution from Aetna on account of payments made or to be made by Robins to Dalkon Shield claimants. Aetna, in a counterclaim, understandably contended that the Debtor would, under such a theory, be liable to it for payments by Aetna to Dalkon Shield claimants.

The Court has consistently sought a consensual plan of reorganization. In December, 1987, after a number of days of ora tenus proceedings involving experts for each of the official committees, Aetna and the Debtor, the Court determined that any such plan must provide, in the Court's estimation, for payment of Dalkon Shield claims and related expenses the sum of $2,475 billion over a reasonable period of time.

The Official Committees and the Debtor have now agreed upon a plan of reorganization which attains that goal. This plan will shortly be presented to all claimants for their approval or rejection.

The reorganization plan is dependent upon a merger by the Debtor with a subsidiary to be created by American Home Products Corporation ("American Home Products"). The funding of a Claimant's Trust would be provided by American Home Products, with contributions by individual members of the Robins family and participation by Aetna as a settler in the *Breland* case. While the amount to be contributed by Aetna may or may not be suffi-

---

6. *See* Affidavit of John G. Harkins, Jr. (attached hereto as Appendix A).

cient for court approval, as any class settlement must be separately approved after a hearing, Aetna's participation is unquestionably an integral aspect of the Debtor's Plan of Reorganization.

*Discussion*

Plaintiffs sought and still seek certification of two classes of persons:

Class A being all those individuals who have complied with orders of the Federal District Court for the Eastern District of Virginia governing the filing of proofs of claim and questionnaires noting injuries or potential injuries from the use of the Dalkon Shield.

Class B being all other individuals who may have been eligible to comply with the orders of the Federal District Court for the Eastern District of Virginia but did not do so.

For reasons of its own interest in achieving an efficient resolution of all claims by Dalkon Shield users against it in one proceeding, and because of its professed concern for the public interest in avoiding lengthy and costly litigation throughout the country as had characterized the pre-petition Dalkon Shield litigation against Robins, Aetna supports the class action.

Accordingly, Aetna stipulated that, if the action were certified as a class action, Aetna would agree to having noncommon issues of individual medical causation and individual amount of damages decided in the claims resolution process found by the Court to be appropriate for liquidating and paying the claims of the Dalkon Shield claimants.

In December, 1986, after briefing and argument on behalf of all parties who wished to be heard, this Court, principally for purposes of expediting pre-trial discovery, entered an order provisionally certifying the *Breland* action as a class action, subject to further determination by the Court as to the appropriate provision or provisions of Fed.R.Civ.P. 23 under which certification would be proper, if at all.

The movants of the instant motion seek a certification under Fed.R.Civ.P. 23(b)(1) for settlement purposes with no opt-out privileges, or in the alternative, a certification of such a class with opt-out rights for Class B members' compensatory damage claims only. The settlement aspect is material in considering appropriate, if any, certifications under Rule 23, because the requirements of Rule 23 may be more easily satisfied in the settlement context than in the more complex litigation context.

Since the proposed *Breland* settlement is so intertwined with the Debtor's proposed Plan of Reorganization which is being recommended to the Dalkon Shield claimants by each of the Official Committees, and since the Court's initial reaction is affirmative, the proposed settlement is preliminarily deemed to be fair and reasonable at least for purposes of class notice thereof.

The primary issue which the Court must ultimately determine in a settlement context is whether the class's claims were fairly and vigorously advocated in non-collusive negotiations reaching a fair and reasonable settlement. *See generally* 2 H. Newberg, *Newberg on Class Actions* § 11.27A (2d ed. Supp.1987).

*Prerequisites of Rule 23(a)*

The Court is, as evidenced by its December 1986 conditional certification, satisfied that all requirements of Fed.R. Civ.P. 23(a) have been satisfied. Rule 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

First, joinder of all potential members of the class is impractical. Potentially, every Dalkon Shield user who suffered or may suffer an injury from its use are appropriate members. A conservative number would be in excess of 325,000 individuals. Indeed, in addition to the more than 300,-000 individuals who filed an initial notice of their claim, a large number of individuals

may qualify as members although they did not initially file a notice of claims in the Chapter 11 proceedings. Consequently, each of the proposed *Breland* classes would render joinder of either class impracticable.

Second, common questions of law or fact exist among the named plaintiffs and members of the class.

Third, the claims of the individual *Breland* plaintiffs are typical of the class members claims. Indeed, Aetna's alleged liability to class members must be premised on facts arising out of its relationship with the Debtor. There are no allegations of direct contact by Aetna with the plaintiffs and there have been no suggestions that Aetna had any relationship with the alleged injuring device except as an insurer.

Furthermore, Aetna's stipulation that non-common issues of individual medical causation and individual amount of damages would be decided in the claims resolution process eliminates, as a practical matter, uncommon or atypical individual issues. Indeed, this stipulation eliminates obstacles frequently present in tort actions where plaintiffs seek to certify a class.

This stipulation would enhance the manageability of the litigation even if the settlement were rejected. Simply stated, Aetna's liability, at any point of time covered by the *Breland* complaint, would not be resolved on a plaintiff-by-plaintiff basis. Not unlike *In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718 (E.D. N.Y.1983), *mandamus denied sub nom. In re Diamond Shamrock Chemicals Co.,* 725 F.2d 858 (2d Cir.), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984), *aff'd,* 818 F.2d 145 (2d Cir.1987), Aetna's liability is an all-or-nothing proposition. In *Agent Orange,* the Court certified a class partially on the ground that the "defendants contest liability not just as to individual members of the class, but as to any members of the class." 100 F.R.D. at 723. Similarly here, each of the theories asserted in the complaint gives rise to a common question of law.

Fourth, the Court has previously held that the plaintiffs would provide fair and adequate representation. Accordingly, the Court finds that the prerequisites of Rule 23(a) are satisfied.

*The Coverage Litigation*

■ The *Breland* plaintiffs have, in Count IX of their Third Amended Complaint, challenged the validity of an agreement entered into by Robins and Aetna in 1984 for purposes of settling the issue of Aetna's liability, as insurer, for punitive damage verdicts or awards entered against the Debtor.

Individual actions relating to what rights and liabilities arise in favor of plaintiffs regarding the settlement of the coverage litigation necessarily encompass an interpretation of the contracts between Aetna and Robins, as embodied in the written insurance policies issued by Aetna, and involve defining the relationship, duties and obligations which Aetna, or any insurer, would owe to its insured and the public at large arising from the provision of products liability insurance coverage. As a consequence, there is a danger that in individual adjudications (entailing as it might thousands of cases) inconsistent or varying adjudications concerning Aetna's obligations and liabilities as an insurer.

The products liability policies of Robins constitute valuable property of Robins' estate. The settlement of the coverage litigation increased the amount of insurance available to Robins from the amount Aetna had contended was available in the coverage litigation. The amount of unused insurance which now remains available to Robins to satisfy Dalkon Shield claims was the subject of a report by this Court's appointed Examiner, who relied upon, in part, the settlement agreement in the coverage litigation as a point of departure for his analysis.

Based on the Examiner's review of the releases obtained in the coverage litigation settlement and the adequacy of that settlement, Robins and Aetna have agreed to resolve the action for contribution against Aetna on behalf of Robins, Aetna's alternative counterclaim for contribution against Robins, and Aetna's substantial proof of

claim against the remaining insurance (subject to Court approval). This proposed settlement of all such issues, as reflected in the Plan, has facilitated the formation and prospective confirmation of the Plan.

Multiple adjudications of the challenge to the validity of the settlement agreement of the coverage litigation would create uncertainty as to the amount of insurance which is available to Robins, and thereby to the Claimants Trust, for the satisfaction of claims. Consequently, such adjudications potentially could disrupt or jeopardize the proposed settlement between Aetna and Robins described above and the inclusion of that settlement as an integral part of the Plan.

In addition, multiple adjudications of the *Breland* action's challenge to the validity of the settlement of the coverage litigation pose the risks inherent to multi-party disputes over a limited fund. Such a claim must be litigated in a single forum because, if successful, individual plaintiffs' challenges would reopen the coverage dispute so as to risk a decrease in the insurance available to compensate Dalkon Shield victims. Accordingly, certification of a mandatory class with respect to the coverage litigation under Rules 23(b)(1)(A) and (B) and 23(c)(4) (certification with respect to a particular issue) is appropriate.

*Breland Settlement and Proposed Plan of Reorganization*

■ Following protracted negotiations between the parties, and after what has been represented to the Court as extensive discovery between Aetna and the Class plaintiffs, a settlement, subject to the Court's approval, was reached. The Court, whose Examiner was present during many of the negotiation sessions concerning not only the *Breland* claim, but also the Debtor's Plan of Reorganization, was cognizant of the efforts and indeed was called upon from time to time to endeavor to assist in what were long and tedious sessions held in an effort to reach a consensual Plan of Reorganization.

By its terms, the Settlement Agreement requires substantial consideration to be provided by Aetna for the benefit of the members of the Class, in terms of a cash payment and various insurance policies to be made available. The predominant portion of Aetna's contribution under the Settlement Agreement will become an indispensable part of and will be distributed directly through the Dalkon Shield Claimants Trust established pursuant to the present Robins' Plan (if the *Breland* settlement is ultimately found fair, reasonable and adequate by this Court and approved pursuant to Fed.R.Civ.P. 23(e), and upheld on appeal.)

More specifically, the settlement in this action has been structured to provide benefits to both *Breland* classes, those in Class A and those in Class B. In the case of Class A, Aetna has agreed to provide certain funds in the net amount of $75 million to be added directly to the Claimants Trust. In addition, Aetna would furnish the Claimants Trust with a policy of insurance in the amount of $250 million, which is excess funding for the Claimants Trust. That is, this excess policy would provide further funds to the Claimants Trust in the event that the Claimants Trust is required to expend all of the money deposited in it plus the investment income on those funds.

In the case of Class B, Aetna has agreed to provide two policies of insurance (the "Outlier policies") totalling $100 million. Class B consists of individuals not eligible to claim against the Claimants Trust for failure to comply with the procedures of the bankruptcy case. By agreement, these claims will be processed through the Claims Resolution Facility which is being established by the Claimants Trust. A more complete description of Aetna's obligations and rights under the settlement is set forth in the Settlement Agreement and in the Plan.

The Settlement Agreement is also structured to avoid the further expenses of burdensome litigation, and to facilitate the overall resolution of claims concerning the Dalkon Shield by channelling claims into a unified claims resolution process and by providing additional funding for the purpose of effectuating this mechanism.

The proposed Settlement Agreement constitutes a "Qualified *Breland* Settlement" under the Plan, as that term is defined in Section 6.06 thereof. The approval of a "Qualified *Breland* Settlement" by this Court is the only non-waivable condition of the American Home Products–Robins Merger Agreement. Pursuant to the terms of Section 6.06 of the Plan, upon "payment in full," that is, payment of the amount agreed to or awarded, from the Claimants Trust, claimants may not commence or continue litigation against Aetna relating to the Dalkon Shield.

By this settlement, substantial additional consideration flows into the Claimants Trust for the benefit of the claimants who are eligible to apply for distribution from that Trust through the Claims Resolution Facility established by the Debtor's Plan. Such additional funds increase the likelihood of the adequacy of the Trust over time, if amounts are needed above the Court's estimation, and protect Robins, American Home Products, and all potential claimants from the consequences, if any, of a shortfall. In addition, by providing substantial consideration in the form of two Outlier Policies to compensate those who are not eligible to apply for distribution in the bankruptcy case, the settlement would provide compensation for claimants whose injuries might not otherwise be redressed.

A single adjudication is required because all of the claims against Aetna, focus primarily on Aetna's conduct vis-a-vis its relationship with its insured. Multiple adjudications of the identical factual and legal issues thus implicated could yield incompatible standards and conflicting decisions concerning Aetna's role as an insurer to Robins and to others.

Indeed, an opt-out class of Dalkon Shield claimants permitting them to sue Aetna for both compensatory and punitive damages would effectively nullify the *Breland* class settlement under paragraph 6(a) of the Settlement Agreement, and render the Debtor's Plan of Reorganization voidable. The American Home Products and A.H. Robins merger is dependent on settlement of *Breland* on a class basis which, in turn, is dependent on Aetna's ability to be relieved of the danger of masses of individual suits stemming from their association with the Debtor.

The effect of permitting Class A members to opt out, thus triggering such contingencies as are contained in the *Breland* settlement and the American Home Products–Robins Merger Agreement, coupled with the loss of Aetna's contribution to the Plan of Reorganization, would be entirely inconsistent with the Bankruptcy Code, *see, e.g.,* 11 U.S.C. § 1129(a), as well as with accepted class action jurisprudence. *See Kincaid v. General Tire & Rubber Co.,* 635 F.2d 501, 508 (5th Cir.1981).

The Class members will be adequately protected under Rule 23(e). They are entitled to and will receive an opportunity to be heard on the adequacy and fairness of the settlement.

The Court will not approve any opt-out provision with respect to Class A members. These members qualify to recover full compensation for all Dalkon Shield claims from the Claimants' Trust through the facility established by the Plan. In addition, the plan provides that the Trust will be established and sufficiently funded by contributions by American Home Products and part of the proceeds of the proposed Aetna class settlement in an amount which satisfies the Court will be sufficient to compensate present and future Dalkon Shield claimants. Under these circumstances, opt-out rights for Class A members, (apart from creating the likelihood of inconsistent verdicts against Aetna) would severely impede the interests of other class members as a practical matter.

As heretofore noted, the Merger and the Plan are conditioned on an approval of the *Breland* settlement for multiple practical reasons. Further, the Fourth Circuit has determined that claims against Aetna are so closely related to claims against Robins, that claims against Aetna, "[i]nevitably, Aetna must involve Robins," and "Robins will inexorably be drawn into [such] litigation." *Oberg v. Aetna Casualty & Surety Co.,* 828 F.2d at 1026. "Because this involvement will put a substantial burden on

Robins, it will detract from the reorganization process." *Id.* Under these circumstances, the objectives of the Plan to fully compensate tort claimants and to end Robins' involvement in all Dalkon Shield litigation through the creation of a fully-funded Claimants' Trust and through merger with a subsidiary of American Home Products will be frustrated if Class A members are permitted to opt out to sue Aetna for compensatory damages.

Moreover, permitting Class A members to opt out and to sue Aetna for compensatory damages, is to, as one counsel in argument opposing a mandatory class envisioned, encourage claimants to join the Trust as co-defendant in a jury trial after they have complied with the provisions of the Claims Resolution Facility for resolving their claim. Under those circumstances, the number of issues raised in such suits, and the cost of defending them will be greatly expanded, all of which will inure to the detriment of other claimants.

The Court's conclusion as to the sums needed to satisfy the Dalkon Shield Claimants did not encompass the added expense which inevitably flows from a multi-party suit.

■ The *Breland* Settlement, by negotiation between Aetna and the class, provides for the possibility of an opt-out for Class B members as to compensatory damages only. The Court will preserve this. While Fed.R.Civ.P. 23 does not provide for opt-out rights in class suits certified under 23(b)(1) or (2), "[p]arties to a proposed class action settlement may themselves provide for an opt out procedure by which class members may exclude themselves from the class and litigate their claims in the same action or in a separate lawsuit." *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1154 (11th Cir.1983).

### Definition of the Classes

■ Plaintiffs' proposed class definitions are intended to dovetail the bankruptcy reorganization in the following respect. Class A, consisting of claimants who have properly followed the Court-ordered procedures of the bankruptcy reorganization,

would be able to participate fully in the claimants' trust. Class B, consisting of claimants who have failed to comply with such procedures, would participate in the claimant's trust, under the proposed Plan of Reorganization, only on a subordinated basis. That is, if and when there are funds remaining after timely claims are paid, untimely compensatory damage claims will be paid.

Some claimants, however, who have failed to comply with the procedures of the bankruptcy case, have or will be able to demonstrate excusable neglect for such failure pursuant to Bankruptcy Rule 9006. These claimants will be deemed to have properly complied with the procedures and thereby participate in the claimants' trust on an unsubordinated basis. As a result, the class definitions shall be clarified to include the "excusable neglect" claimants within Class A.

Accordingly, Class A shall be defined as "All those individuals who have complied, or are deemed to have complied by the demonstration of excusable neglect, with the orders of the Federal District Court for the Eastern District of Virginia governing the filing of proofs of claim and questionnaires noting the use of the Dalkon Shield." Class B shall be defined as "All other individuals who may have been eligible to comply with the orders of the Federal District Court for the Eastern District of Virginia but did not do so and are not deemed to have done so."

### Conclusion

In light of the fact that each of the requirements mandated by Rule 23 as to certifications of a class are present in this cause and specifically those contained in Rule 23(b)(1), the Court will certify both Class A and Class B under Rule 23(b)(1) reserving to Class B members the right to opt out as to compensatory damages only. Class A members, Dalkon Shield claimants who are found to be eligible under the Plan of Reorganization, shall be deemed to be mandatory class members for all purposes.

The Court is satisfied that the foregoing is required under the law and the facts of this case.

All Dalkon Shield claimants who may have a claim for punitive damages against Aetna are before the Court both in the Plan of Reorganization and one of its integral parts, the *Breland* class action and its Settlement Agreement. It is entirely appropriate that the Plan of Reorganization, if approved, will provide full compensation to all members of Class A, including punitive damages. Class B members, who have only subordinated claims against the Trust, will be eligible for compensation from the policies supplied by Aetna as part of its Settlement Agreement.

The Debtor, in this manner, will be free of all litigation concerns and may, after confirmation and consummation, engage in a successful reorganization. A single, aggregate amount of punitive damages, as called for in the proposed Plan, will be required to facilitate a successful reorganization.

An appropriate Order will issue.

### APPENDIX A

### AFFIDAVIT OF JOHN G. HARKINS, JR.

COMMONWEALTH OF PENNSYLVANIA:
                    SS
COUNTY OF PHILADELPHIA:

John G. Harkins, Jr., being duly sworn according to law, deposes and says:

1. He is a member in good standing of the Bar of the Supreme Court of the Commonwealth of Pennsylvania, the Supreme Court of the United States, and of various other federal courts, including the Bar for the Court of Appeals for the Fourth Circuit. He has also been admitted *pro hac vice* to represent the interests of Aetna Casualty and Surety Company in various matters relating to A.H. Robins Company, Inc. or the Dalkon Shield in the United States District Court for the Eastern District of Virginia, including this action.

2. He and his law firm, Pepper, Hamilton & Scheetz, were retained by Aetna Casualty and Surety Company in 1984 to advise Aetna in connection with matters arising out of Aetna's relationship with Robins, as its insurer.

3. Commencing in early 1985, various Dalkon Shield claimants began filing actions naming Aetna as an additional defendant in Dalkon Shield litigation under theories of liability very similar to those which appear in the Third Amended Complaint in the above-captioned action (except for Count IX). Deponent was in charge of Aetna's defense in all such actions. Before Robins filed its Petition for Reorganization on August 21, 1985, approximately 140 such actions had been instituted in a number of state and federal courts throughout the country. In every such case in which it was timely to do so (before all such cases were stayed), Aetna filed a motion to dismiss, either under Rule 12 of the Federal Rules of Civil Procedure or under an equivalent state rule. In 36 of these cases, a ruling was issued by the presiding judge on Aetna's motion before the stay became effective and in every such instance, the presiding judge granted Aetna's motion and dismissed the action accordingly. In four additional cases, plaintiffs withdrew their claims against Aetna before a ruling and various additional cases were voluntarily dismissed in light of the stay of proceedings.

/s/ John G. Harkins, Jr.
JOHN G. HARKINS, JR.

Sworn to and subscribed before me this 4th day of April, 1987:

Clare A. Reilly
NOTARY PUBLIC