**Edward J. CARLOUGH, et al., on behalf of themselves and others similarly situated, Plaintiffs,**

v.

**AMCHEM PRODUCTS, INC., et al., Defendants and Third Party Plaintiffs,**

v.

**ADMIRAL INSURANCE COMPANY, et al., Third Party Defendants.**

Civ. A. No. 93–0215.

United States District Court, E.D. Pennsylvania.

Oct. 6, 1993.

William R. Hanlon, Wendy S. White, David Booth Beers, Elizabeth Runyon Geise, John D. Aldock, Shea & Gardner, Washington, DC, John G. Gaul, Center for Claims Resolution, Princeton, NJ, for Amchem Products, Inc., A.P. Green Industries, Inc., Armstrong World Industries, Inc., Certainteed Corp., C.E. Thurston & Sons, Inc., Dana Corp., Ferodo America, Inc., Flexitallic, Inc., GAF Bldg. Materials Corp., I.U. North America, Inc., Maremont Corp., Nat. Gypsum Co., Nat. Services Industries, Inc., Nosroc Corp., Pfizer, Inc., Quigley Co., Inc., Shook & Fletcher Insulation Co., T & N, PLC, Union Carbide Chemicals and Plastics Corp., and U.S. Gypsum Co.

Steven Kazan, Kazan, McClain, Edises & Simon, Oakland, CA, and Harry F. Wartnick, Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, San Francisco, CA, for Northern California Asbestos.

David G. Davies, Ray, Robinson, Carle, Davies & Snyder, Cleveland, OH, for Multiple Shipowners represented by Ray Robinson Carle Davies & Snyder.

Brian Wolfman, Public Citizen Litigation Group, Washington, DC, for Myles O'Malley, Public Citizen, Inc., White Lung Ass'n of New Jersey and Nat. Asbestos Victims Legal Action Organizing Committee.

Arthur H. Bryant, Trial Lawyers for Public Justice, Washington, DC and Roberta B. Walburn, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for Asbestos Victims of America and Trial Lawyers for Public Justice.

Philip A. Harley and Alan R. Brayton, Brayton, Gisvold & Harley, Novato, CA, for Certain Class Members—"Brayton Parties."

Michael V. Kelley, Climaco, Climaco, Seminatore, Lefkowitz & Garofoli Co., L.P.A., Cleveland, OH, for Labor Union Objectors: Gary Fujawa, South Bend, Indiana, Intern. Vice President, Intern. Ass'n of Heat and Frost Insulators & Asbestos Workers; Michael Morgan, Cleveland, Ohio, Business Manager, United Ass'n of the Plumbing and Pipe Fitting Industry; Anthony Yakemowicz, Pittsburgh, Pennsylvania, Intern. Vice President, Intern. Broth. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers &

Stephen B. Burbank, Professor, pro se.

Jonathan W. Miller, Gene Locks, Greitzer and Locks, Philadelphia, PA, Joseph F. Rice, Ness, Motley, Loadholt, Richardson & Poole, Charleston, SC, Ronald Motley, Ness, Motley, Loadholt, Richardson & Poole, Charleston, SC, Russell W. Budd, Frederick M. Baron, Brent M. Rosenthal, Baron & Budd, P.C., Dallas, TX, and Desa A. Ballard, Ness, Motley, Loadholt, Richardson & Poole, Barnwell, SC, for Edward J. Carlough, Pavlos Kekrides, Nafssica Kekrides, Laverne Winbun, Ambrose Vogt, Jr., Joanne Vogt, Carlos Raver, Dorothy M. Raver, John A. Baumgartner, Anna Marie Baumgartner, Timothy Murphy, Gay Murphy, Ty T. Annas, and Fred Angus Sylvester, on behalf of themselves and all others similarly situated.

Helpers; Lawrence McManamon, Cleveland, Ohio, Intern. Vice President, Intern. Broth. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers.

Christine T. Milliken, Washington, DC, for Nat. Ass'n of Attys. Gen.

Joseph A. Rosenborough, Georgia Pacific Corp., Atlanta, GA, for Georgia–Pacific Corp.

Joel M. Ressler, Office of Atty. Gen., Harrisburg, PA, for Atty. Gen. of PA.

Charles B. Blakinger, R. Nicholas Gimbel, Hoyle, Morris & Kerr, Michael T. Starczewski, Philadelphia, PA, Theodore Voorhees, Jr., Lawrence J. Eisenstein, Rachel S. Kronowitz, Charles E. Buffon, Neil K. Roman, and Russell H. Carpenter, Jr., Covington & Burling, Washington, DC, for Amchem Products, Inc., A.P. Green Industries, Inc., Armstrong World Industries, Inc., Certainteed Corp., C.E. Thurston & Sons, Inc., Dana Corp., Ferodo America, Inc., Flexitallic, Inc., GAF Bldg. Materials Corp., I.U. North America, Inc., Maremont Corp., Nat. Gypsum Co., Nat. Services Industries, Inc., Nosroc Corp., Pfizer, Inc., Quigley Co., Inc., Shook & Fletcher Insulation Co., T & N, PLC, Union Carbide Chemicals and Plastics Corp., and U.S. Gypsum Co.

Michael E. McGilvery, Wright, Young & McGilvery, Plymouth Meeting, PA, for Admiral Ins. Co.

Allan C. Molotsky, Post & Schell, P.C.; Stephen F. Brock, Joseph G. Manta, Manta and Welge, Philadelphia, PA, and Maryann C. Hayes, Pope & John, Ltd., Chicago, IL, for Affiliated FM Ins. Co. and Appalachian Ins. Co. of Providence.

Norman L. Haase, Dunn, Haase, Sullivan, Mallon, Cherner & Broadt, Media, PA, and Aaron L. Bowers, Lynberg & Watkins, Los Angeles, CA, for AIU Ins. Co., American Home Assur. Co., Granite State Ins. Co., Ins. Co. of State of Pa., Landmark Ins. Co., Lexington Ins. Co., Nat. Union Fire Ins. Co. of Pittsburgh, Pa., Union Atlantique De Reassurances, and New Hampshire Ins. Co.

Mitchell S. Pinsly, and Elit R. Felix, II, Margolis, Edelstein & Scherlis, Philadelphia, PA, for Allianz Ins. Co., Allianz Underwriters Ins. Co., Interstate Fire & Cas. Co.

Walter H. Swayze, III, Liebert, Short & Hirshland; Stephen W. Miller, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, Philip J. McGuire; and Virginia M. Vermillion, Gleason, McGuire & Schreffler, Chicago, IL, for Allstate Ins. Co. and Northbrook Indem. Co.

Philip L. Greenberg, Dilworth, Paxson, Kalish & Kauffman; and John M. Fitzpatrick, Philadelphia, PA, for American Bankers Ins. Co., Old Republic Ins. Co., Puritan Ins. Co. of Florida.

Joseph M. Oberlies, Connor and Weber, P.C., Philadelphia, PA, for American Centennial Ins. Co.

Lawrence A. Nathanson, Drinker, Biddle & Reath; Wilson M. Brown, III, Drinker, Biddle & Reath, Philadelphia, PA, for American Motorists Ins. Co. and Lumbermens Mut. Cas. Co.

Stephen F. Brock, Joseph G. Manta, Manta and Welge, Philadelphia, PA, and Thomas R. Newman, James H. Harrington, and Christine L. Andreoli, Newman & Harrington, New York City, for American Re–Insurance Co.

Elit R. Felix, II, Margolis, Edelstein & Scherlis, Philadelphia, PA, for Argonaut Ins. Co.

Thomas C. Delorenzo, John S. Tucci, Jr., Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA and Linda B. Foster, Neely & Player, Atlanta, GA, for Atlanta Intern. Ins. Co.

Jay M. Levin, Cozen and O'Connor, Philadelphia, PA, for C.E. Heath Compensation and Liability Ins. Co.

William H. Black, Jr., Hecker, Brown, Sherry and Johnson, Philadelphia, PA, for Centennial Ins. Co.

David E. Sandel, Jr., White and Williams; and Lawrence M. Silverman, Philadelphia, PA, for Cent. Nat. Ins. Co. of Omaha.

Mitchell S. Pinsly; Elit R. Felix, II, Margolis, Edelstein & Scherlis, Philadelphia, PA, Henry E. Hockeimer, Jr., Steven K. Davidson, and Daniel Sauls, Steptoe & Johnson, Washington, DC, for Chicago Ins. Co. and City Ins. Co.

Robert R. Reeder, Cozen & O'Connor; Keith R. Dutill, John P. O'Dea, Stradley, Ronon, Stevens & Young, Philadelphia, PA, Stephen C. Baker, Stradley, Ronon, Stevens & Young, Malvern, PA, for Columbia Cas. Co.

Robert R. Reeder and Jay M. Levin, Cozen and O'Connor, Philadelphia, PA, for Commercial Union Ins. Co. and Safeco Ins. Co. of America.

Thomas Richichi, Washington, DC, for Compagnie Europeenne De Reassurances.

Daniel P. Lynch, Timby, Brown & Timby, Philadelphia, PA, Michael V. Corrigan and David A. Vann, Simpson, Thacher & Bartlett, New York City, for Constitution State Ins. Co., Travelers Indem. Co., and Travelers Ins. Co.

Keith R. Dutill, John P. O'Dea, Stradley Ronon Stevens & Young, Philadelphia, PA and Stephen C. Baker, Stradley Ronon Stevens & Young, Malvern, PA, for Continental Cas. Co.

Michael J. Jones, Jo Ann Burk, Cuyler, Burk & Matthews, Morristown, NJ, for Employers Mut. Cas. Co.

Daniel P. Lynch, Timby, Brown & Timby, Philadelphia, PA, for Evanston Ins. Co.

Stephen F. Brock, Manta & Welge, Philadelphia, PA, Thomas R. Newman, James H. Harrington, and Christine L. Andreoli, Newman & Harrington, New York City, for Executive Re Indem. Inc.

William P. Shelley, Countess & Shelley, Philadelphia, PA, for Federal Ins. Co.

Donald P. Jacobs, Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, P.C., Short Hills, NJ, for Gen. Reinsurance Corp., North Star Reinsurance Corp.

Sean R. Kelly, David D'Aloia, Saiber, Schlesinger, Satz & Goldstein, Newark, NJ, and E. Timothy Poindexter, Law Offices of William W. Kimball, Philadelphia, PA, for Gibraltar Cas. Co., Prudential Reinsurance Co.

Patrick W. Kittredge, Kittredge, Donley, Elson, Fullem & Embick, Philadelphia, PA, Jay Lavroff, Timothy D. Lyons, Lindabury, McCormick & Estabrook, Westfield, NJ,

Daniel J. Maher, Kittredge, Donley, Elson, Fullem & Embick, Philadelphia, PA, for Great American Ins. Co.

David E. Sandel, Jr., White and Williams, Philadelphia, PA, Justin J. McCarthy, Exton, PA, and Patrick J. Dwyer, Polstein, Ferrara & Dwyer, P.C., New York City, for Highlands Ins. Co.

Mitchell S. Pinsly, Margolis, Edelstein & Scherlis, Philadelphia, PA, Henry E. Hockeimer, Jr., Steven K. Davidson, and Daniel Sauls, Steptoe & Johnson, Washington, DC, for The Home Indem. Co. and The Home Ins. Co.

Wendy H. Koch, Rawle and Henderson, Philadelphia, PA, Kevin Barry McHugh, and Carl H. Sword, Costello & Shea, New York City, for Houston Gen. Ins. Co.

Thomas C. Delorenzo, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, for Jefferson Ins. Co. of New York.

Susan G. Fillichio and Kevin G. Costello, Sedgwick, Detert, Moran & Arnold, New York City, for La Preservatrice Fonciere Tiard and Lilloise D'Assurances.

Rudolph Garcia, Saul, Ewing, Remick & Saul, Philadelphia, PA, Thomas W. Brunner, William G. Miller, and Samuel D. Walker, Wiley, Rein & Fielding, Washington, DC, for Maryland Cas. Co.

Robert Caplan and Louis J. Isaacsohn, Wilson, Elser, Moskowitz, Edelman & Dicker, Philadelphia, PA, for Mead Reinsurance Corp.

Allan C. Molotsky, Post & Schell, P.C., Philadelphia, PA, for Michigan Mut. Ins. Co.

Richard W. Yost, L'Abbate & Balkan, Philadelphia, PA and James W. Greene, Bromley, Greene & Walsh, Washington, DC, for Nat. American Ins. Co. of California and Yosemite Ins. Co.

Bernd G. Heinze, Wilson, Elser, Moskowitz, Edelman & Dicker, Philadelphia, PA, for Northwestern Nat. Ins. Co. and Safety Nat. Cas. Corp.

Lewis R. Olshin, Duane, Morris & Heckscher, Philadelphia, PA, for Pennsylvania Manufacturers' Ass'n Ins. Co.

Lawrence M. Silverman, Philadelphia, PA, for Protective Nat. Ins. Co. of Omaha.

Justin J. McCarthy, Exton, PA and Patrick J. Dwyer, Polstein, Ferrara and Dwyer, P.C., New York City, for Ranger Ins. Co.

Stephen P. Chawaga, Fitzpatrick and Tanker, Philadelphia, PA, Peter N. Hillman and Debra M. Patalkis, Chadbourne & Parke, New York City, for Republic Ins. Co.

Larry G. Cobb, Cobb, Raynor & Mandel, Bala Cynwyd, PA, Bethany K. Culp and Jeffrey J. Bouslog, Oppenheimer, Wolff & Donnelly, St. Paul, MN, for St. Paul Fire and Marine Ins. Co., St. Paul Guardian Ins. Co., and St. Paul Surplus Lines Ins. Co.

Lisa B. Zucker, German, Gallagher & Murtagh, Philadelphia, PA and David Holmes, Sheft & Sheft, New York City, for Stonewall Ins. Co. and Stonewall Surplus Lines Ins. Co.

Suzette D. Bonfiglio, Jubanyik, Varbalow, Tedesco, Shaw & Shaffer, Cherry Hill, NJ, for Sun Alliance and London Ins. PLC.

Wendy H. Koch, Rawle and Henderson, Philadelphia, PA, for Tokio Marine & Fire Ins. Co., Ltd.

Michael P. Shay, Shay, Santee & Kelhart, Bethlehem, PA, for Unigard Sec. Ins. Co.

Russell W. Budd, Frederick M. Baron, and Brent M. Rosenthal, Baron & Budd, P.C., Dallas, TX, for Carl D. Roland, Gloria J. Roland, Walter L. Mays, Sr. and Shirley G. Mays.

Tybe A. Brett and Antonio D. Pyle, Henderson & Goldberg, P.C., Pittsburgh, PA, for Ronald J. Smith, Josephine Smith, Walter Yastion, Helen Mae Yastion, Harry L. Cooper, Margaret J. Cooper, Jordan Kushnier, Mary Kushnier, Randy L. Ward, Samuel J. Gallaher and Marion E. Gallaher.

Gita F. Rothschild, McCarter & English, Newark, NJ, for Keene Corp.

Leonard C. Jaques, the Maritime Asbestosis Legal Clinic, Detroit, MI, for Maritime Asbestos Claimants and U.S. Merchant Marine Seamen.

Donald I. Marlin, Weitz & Luxenberg, P.C., New York City, for Ralph T. Mitchell, Howard I. Cummings, Matthew T. Mullero, Andrew J. Kurtz and Harold E. Switzer.

Robert N. Spinelli, Kelley, Jasons, McGuire & Spinelli, Philadelphia, PA and

Anne E. Cohen, Debevoise & Plimpton, New York City, for Owens–Corning Fiberglas Corp.

Brian E. Berwick, Asst. Atty. Gen., Environmental Protection Div., Austin, TX, for State of Tex.

Stephen M. Snyder, Brobeck, Phleger & Harrison, San Francisco, CA, for Fibreboard Corp.

James J. Restivo, Jr., Kathy K. Condo, Reed, Smith, Shaw & McClay, Pittsburgh, PA and Andrew J. Trevelise, Reed, Smith, Shaw & McClay, Philadelphia, PA, for Pittsburgh Corning Corp.

Robert H. Riley, Schiff, Hardin, & Waite, Chicago, IL, James D. Miller, King & Spalding, Washington, DC, and R. Bruce Shaw, Nelson, Mullins, Riley & Scarborough, Columbia, SC, for Owens–Illinois, Inc.

Jay Hughes, Boca Raton, FL and Robert A. Murphy, Casner & Edwards, Boston, MA, for W.R. Grace & Co.—Conn.

John McN. Broaddus, Connerton, Ray & Simon, Washington, DC, for Laborers' Intern. Union of North America.

Tybe A. Brett, Henderson & Goldberg, P.C., Pittsburgh, PA, for Gregory Gore, William C. Ferrel, Michael P. Conley and Lynn A. Conley.

Paul Safchuck, White Lung Ass'n, Baltimore, MD, for White Lung Ass'n.

Russell W. Budd, Frederick M. Baron, Brent M. Rosenthal, Baron & Budd, P.C., Dallas, TX, Brian Stuart Koukoutchos, Lexington, MA, and Laurence H. Tribe, Harvard Univ. Law School, Cambridge, MA, for Shelva D. Wiese, Carl D. Payne, Sr. and Helen E. Payne.

Redding Pitt, Asst. Atty. Gen., Office of the Atty. Gen., State of Ala., Montgomery, AL, for State of Ala.

Richard C. Binzley and Harold W. Henderson, Thompson, Hine & Flory, Cleveland, OH, for Multiple Shipowners, represented by Thompson, Hine and Flory.

Jeffrey Robert White, Washington, DC, for Ass'n of Trial Lawyers of America.

Laurence Gold, Gen. Counsel, AFL–CIO, Washington, DC, for American Federation of Labor and Congress of Indus. Organizations.

## *MEMORANDUM*

LOWELL A. REED, Jr., District Judge.

This lawsuit is a class action for asbestos-related personal injuries. This memorandum opinion addresses whether this Court has subject matter jurisdiction over this case.

## I. BACKGROUND

On January 15, 1993, counsel for the plaintiff class (or the *"Carlough* class") filed the complaint in this action along with motions for class certification and for approval of a proposed settlement agreement ("proposed settlement" or "settlement") between the plaintiff class and the defendants. The complaint alleges that the defendants, members of the Center for Claims Resolution ("the CCR defendants"), are liable to the plaintiff class under the legal theories of (1) negligent failure to warn, (2) strict liability, (3) breach of express and implied warranty, (4) negligent infliction of emotional distress, (5) enhanced risk of disease, (6) medical monitoring, and (7) civil conspiracy. In their complaint, the named plaintiffs allege that jurisdiction is based upon diversity of citizenship and that the amount in controversy for each member of the plaintiff class exceeds $100,-000.

On the same day as the complaint was filed, the CCR defendants answered the complaint and joined in plaintiffs' request that the class be certified and the settlement agreement approved.

On January 29, 1993, the Honorable Charles R. Weiner of this Court conditionally certified an opt-out class consisting of:

1. All persons (or their legal representatives) who have been exposed in the United States or its territories (or while working aboard U.S. military, merchant or passenger ships), either occupationally or through occupational exposure of a spouse or household member, to asbestos or to asbestos containing products for which one or more of the defendants may bear legal liability and who, as of January 15, 1993, reside in the United States or its territories, and who have not, as of January 15, 1993, filed a lawsuit for asbestos-related personal injury or damage, or death in any state or federal court against the defendant(s) (or against entities for whose actions or omissions the defendant(s) bear legal liability).

2. All spouses, parents, children, and other relatives (or their legal representatives) of the class members described in paragraph 1 above who have not, as of January 15, 1993, filed a lawsuit for the asbestos-related personal injury, or damage, or death of a class member described in paragraph 1 above in any state or federal court against the defendant(s) (or against entities for whose actions or omissions the defendant(s) bear legal liability).

Also on January 29, 1993, Judge Weiner assigned to me the scheduling and review of settlement procedures and the resolution of objections to the settlement itself. On March 1, 1993, I issued a Rule to Show Cause ordering that a preliminary hearing be held, and memoranda of law submitted, as to, *inter alia,* the relevant considerations in ultimately evaluating the fairness, adequacy and reasonableness of the settlement. At that time, numerous motions and objections were filed relating to certain threshold matters such as justiciability and diversity jurisdiction.[1] Because these jurisdictional issues relate to the very power of the Court to hear this case and ultimately bind the parties to the settlement, on June 2, 1993, I issued a Scheduling Order setting dates for briefing and argument on all objections to this Court's subject matter jurisdiction. Various objectors filed memoranda of law explaining the legal bases for their objections, to which the named plaintiffs and the CCR defendants (hereinafter the "settling parties") responded. A hearing was held on August 23, 1993 at which time the objectors and the settling parties were heard.

---

1. On April 15, 1993, Judge Weiner dismissed these motions without prejudice to their being filed as objections to the fairness of the proposed settlement.

This memorandum addresses the four principal threshold issues raised by the objectors: standing, collusion, mootness and satisfaction of the amount in controversy for purposes of diversity jurisdiction. I do not address all of the objections raised in the memoranda of law and/or at the August 23, 1993 hearing. However, because of the significance of this lawsuit and the large number of parties claiming an interest, it is necessary to consider these threshold issues in considerable detail.

## II. DISCUSSION

### A. Standing

It is fundamental that a federal court lacks jurisdiction to hear any matter that is not a justiciable case or controversy under Article III of the U.S. Constitution, and that an action is not justiciable if the plaintiff does not have standing to sue. *Bender v. Williamsport Area School District,* 475 U.S. 534, 541–42, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). This question is answered by determining whether the plaintiff has a "personal stake in the outcome of the controversy." *Id.* at 498–99, 95 S.Ct. at 2205. Such a personal stake assures " 'concrete adverseness which sharpens the presentation of the issues.' " *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 804, 105 S.Ct. 2965, 2970, 86 L.Ed.2d 628 (1985) (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). The Supreme Court has held that a party has the requisite personal stake if s/he can demonstrate that: (1) s/he personally has suffered a concrete injury in fact, (2) the injury is fairly traceable to the challenged conduct, and (3) the injury is likely to be redressed by a favorable decision. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)).

The plaintiff always bears the burden of establishing the elements of standing. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). And, these elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case[.]" *Id.* As such, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

Although these three elements appear straightforward, the Supreme Court has more than once acknowledged that "the concept of 'Article III standing' has not been defined with complete consistency in all of the various cases decided by [the] Court which have discussed it[.]" *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990) (quoting *Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760). The Article III policies which are served by the standing requirement, however, have remained clear and constant. It is thus helpful to look to these policies when applying the elements of standing to a particular case.

First and foremost, the standing requirement preserves the separation of powers by limiting the matters that the judicial branch may address. *Lujan,* —— U.S. at ——, 112 S.Ct. at 2136; *Allen,* 468 U.S. at 752, 104 S.Ct. at 3325. In essence, standing doctrine is "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth,* 422 U.S. at 498, 95 S.Ct. at 2205. Under our tripartite system of government, pronouncements about general social problems are left to the legislature. Thus, if a plaintiff lacks a personal stake in the litigation at hand, the court finds itself in the position of extending its role beyond that intended for the judiciary under Article III. *Allen,* 468 U.S. at 750, 104 S.Ct. at 3324.

Second, the standing requirement improves judicial decision-making because it "assures a factual setting in which the litigant asserts a claim of injury in fact[.]" *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758.

This factual setting prevents a federal court from passing judgment on ill-defined issues or controversies which could "pave the way for lawsuits which have some, but not all, of the facts of the case actually decided by the court." *Id.* In other words, the injury complained of must be sufficiently concrete to inform the court of the consequences of its decision. Indeed, the Supreme Court has recognized that judicial review is effective largely because it avoids issues presented in an abstract form. *United States v. Richardson,* 418 U.S. 166, 194, 94 S.Ct. 2940, 2955, 41 L.Ed.2d 678 (1974) (Powell, J., concurring).

Third, the standing requirement assures that the federal courts do not become "a vehicle for the vindication of the value interests of concerned bystanders." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 687, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). The federal courts are reserved for litigants whose lives will be directly affected by the outcome of the lawsuit. And, the injury-in-fact requirement serves to distinguish those litigants from others with a mere interest in the issue. *Id.,* at 689 n. 14, 93 S.Ct. at 2417 n. 14. Without this requirement, the federal courts would be reduced to "publicly funded forums for the ventilation of public grievances[.]" *Valley Forge,* 454 U.S. at 473, 102 S.Ct. at 759. Connected with this policy, of course, is the notion that those directly concerned with the questions at issue are likely to present their cases more effectively.

In this lawsuit, the objectors claim that many of the members of the *Carlough* class do not have Article III standing because they have not sustained an "injury in fact." The objectors note that the *Carlough* class includes those who have been occupationally exposed to asbestos but who do not manifest any asbestos-related condition (hereinafter "the exposure-only plaintiffs"). And, in their memoranda of law, the objectors point to several state and federal cases which have held that "subclinical injury resulting from exposure to asbestos is insufficient to constitute actual loss or damage to a plaintiff's

interest required to sustain a cause of action under generally applicable principles of tort law." *Schweitzer v. Consolidated Rail Corp.,* 758 F.2d 936, 942 (3d Cir.), *cert. denied,* 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985); *see also Alim v. Vaughn,* 1992 WL 209918, 1992 U.S.Dist. LEXIS 12503 (E.D.Pa. Aug. 18, 1992); *Hannibal v. Lyons,* 1990 WL 96121 1990 U.S.Dist. LEXIS 8261 (E.D.Pa. July 2, 1990); *Giffear v. Johns–Manville Corp.,* —— Pa.Super. ——, 632 A.2d 880 (Pa.Super.1993); *Marinari v. Asbestos Corp.,* 417 Pa.Super. 440, 612 A.2d 1021 (1992). The objectors argue that the lack of a cause of action under applicable state tort law mandates a finding that the exposure-only plaintiffs have alleged no injury in fact for purposes of Article III standing.[2]

In response, the settling parties argue that exposure to a toxic substance is sufficient injury in fact and that, for purposes of Article III standing, it is irrelevant whether the plaintiffs' injuries support a valid legal claim.

It is true that prior to 1970, the test for Article III standing was the so-called "legal interest" test. *See Alabama Power Co. v. Ickes,* 302 U.S. 464, 478–80, 58 S.Ct. 300, 303–04, 82 L.Ed. 374 (1938); G. Nichol, *Injury and The Disintegration of Article III,* 74 Calif.L.Rev. 1915, 1920 (1986). Under that test, a plaintiff only had Article III standing "if the actions of the defendant harmed a 'legal interest' of the plaintiff." *Alabama Power Co.,* 302 U.S. at 478–80, 58 S.Ct. at 303–04. In other words, plaintiffs had to show injury sufficient to sustain a valid cause of action to have standing to sue in federal court.

In *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), however, the Supreme Court jettisoned the "legal interest" test and adopted the "injury in fact" test. According to the Supreme Court in *Camp,* "[t]he 'legal interest' test goes to the merits" and is thus "quite distinct from the problem of standing." *Id.* at 152–53 & n. 1, 90 S.Ct. at 829–30 & n. 1. With the adoption

---

**2.** The objectors concede, and I agree, that those members of the plaintiff class who already manifest an asbestos-related condition have Article III standing to bring this lawsuit.

of the injury in fact test, the Supreme Court "intended the injury standard to insulate the case or controversy determination from the sway of the claim on the merits." Nichol, *supra*, at 1923–24. In the years since the *Camp* decision, the Supreme Court has stressed that the requirement of standing "focuses on the party seeking to get his [or her] complaint before a federal court and *not on the issues [s/]he wishes to have adjudicated*." *Valley Forge*, 454 U.S. at 484, 102 S.Ct. at 765 (quoting *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968) (emphasis added)). For example, in *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Supreme Court reversed the lower court's holding as to standing, and stated:

> The Court of Appeals appeared to confuse the question of whether petitioner had standing with the question of whether she asserted a proper cause of action.... The nature of petitioner's injury ... is relevant to the determination of whether she has "alleged such a personal stake in the outcome of the controversy ..." And under the criteria we have set out, petitioner clearly has standing to bring this suit.... Whether petitioner has asserted a cause of action, however, depends not on the quality or extent of her injury, but on whether the class of litigants of which petitioner is a member may use the courts to enforce the right at issue.

**3.** Many other courts have recognized that standing looks only to the existence of a factual injury and not the magnitude or legal significance of that injury. *National Wildlife Fed'n v. Burford*, 871 F.2d 849, 852 (9th Cir.1989); *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 258 n. 5 (2d Cir.1989), *opinion modified on other grounds*, 890 F.2d 569 (2d Cir.1989); *Haskell v. Washington Township*, 864 F.2d 1266, 1275 (6th Cir.1988); *Coalition for Environment v. Volpe*, 504 F.2d 156, 168 (8th Cir.1974); *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 61 (S.D.Ohio 1991); *Honey v. George Hyman Constr. Co.*, 63 F.R.D. 443, 446–47 (D.D.C.1974).

**4.** Also, in *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), the Supreme Court held that the plaintiffs' allegations of environmental and health injuries caused by the construction of two nuclear plants were sufficient to satisfy the injury in fact requirement for Article

*Id.*, at 239–40 n. 18, 99 S.Ct. at 2274 n. 18 (citations omitted).[3]

In sum, the Supreme Court has made clear that the Article III determination "in no way depends on the merits of the plaintiff's [claim]." *Whitmore*, 495 U.S. at 155, 110 S.Ct. at 1723 (quoting *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206).[4] As one commentator put it:

> The terminology employed—injury "in fact" rather than "in law," layperson's injury rather than lawyer's injury—suggests the Court's desire to convert the case or controversy hurdle to a straightforward and objective measurement uninfluenced by the attractiveness of the cause of action
> . . .

. . . . .

> By employing a test of simple harm, the justices could free the system of constitutional review from ill-fitting common law forms. Injury in fact ... could be ascertained without "premature value judgments" about ... the merits of the claim
> . . .

Nichol, *supra*, at 1924. This Court has expressly recognized this principle in the context of another nationwide asbestos case:

> Standing, which derives from the article III case or controversy requirement, is met when the plaintiff can demonstrate "injury in fact." To what extent that injury is legally cognizable under the laws of

III standing. The plaintiffs in *Duke Power* challenged the constitutionality of the Price–Anderson Act which imposes an aggregate limit on utility company liability for nuclear accidents. The Court held that, for purposes of Article III standing, it was of no moment that plaintiffs' injuries were not directly related to the constitutional attack on the statute. *Id.*, at 78–79. The Court stated that, except for certain taxpayer suits, no subject-matter nexus between the right asserted and the injury alleged was required. *Id.* In other words, the Court did not look to the plaintiffs' cause of action to determine whether they had alleged sufficient injury in fact. The *Duke Power* holding, therefore, supports the settling parties' contention that I need not look to the character or merits of the plaintiffs' claims in this case when determining whether they have alleged injury in fact for purposes of Article III standing.

the various jurisdictions is a separate inquiry.

*In re Asbestos School Litigation,* 104 F.R.D. 422, 425 n. 1 (E.D.Pa.1984) (citation omitted), *amended in other respects,* 107 F.R.D. 215 (E.D.Pa.1985), *aff'd in part and rev'd in part on other grounds,* 789 F.2d 996 (3d Cir.1986).

Other lower courts have also recognized the distinction between the existence of an "injury in fact" and the legal significance of that injury by holding that, for purposes of determining Article III standing, the plaintiff's legal theories must be accepted as valid. *See Chiles v. Thornburgh,* 865 F.2d 1197, 1202 (11th Cir.1989) ("just as we accept the validity of the plaintiff's factual assertions, we must also accept the validity of the plaintiff's theory of a cause of action"); *Goldwater v. Carter,* 617 F.2d 697, 701–02 (D.C.Cir.) ("For purposes of the standing issue, we accept, as we must [plaintiff's] pleaded theories as valid."), *vacated on other grounds,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979); *see also United States v. Nichols,* 841 F.2d 1485, 1498 (10th Cir.1988). *But see Robinson v. Vaughn,* 1992 WL 368461 1992 U.S.Dist. LEXIS 19518 (E.D.Pa. Dec. 2, 1992) (court cited to Pennsylvania tort law and held that prisoner exposed to asbestos did not have injury in fact).[5] It is because of this distinction that many federal courts have dismissed cases for failure to state a claim only after concluding that they have subject matter jurisdiction over the case. *See, e.g., Angus v. Shiley, Inc.,* 989 F.2d 142 (3d Cir. 1993); *LFC Lessors, Inc. v. Pacific Sewer Maintenance Corp.,* 739 F.2d 4 (1st Cir. 1984); *Indiana Hi–Rail Corp. v. CSX Transp., Inc.,* 818 F.Supp. 1254 (S.D.Ind. 1993); *Ronwin v. Smith Barney Harris Upham & Co.,* 807 F.Supp. 87 (D.Neb.1992), *aff'd without op.,* 996 F.2d 1221 (8th Cir. 1993); *Grant v. Coca–Cola Bottling Co.,* 780 F.Supp. 246 (D.N.J.1991); *Hough v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 757 F.Supp. 283 (S.D.N.Y.), *aff'd without op.,* 946 F.2d 883 (2d Cir.N.Y.1991); *Wilson v. Briscoe,* 1990 WL 116836 1990 U.S.Dist. LEXIS 9514 (D.D.C. July 30, 1990).

Almost directly on point is *Bowling v. Pfizer, Inc.,* 143 F.R.D. 141 (S.D.Ohio 1992). In that case, the defendants were manufacturers of heart valves that later proved faulty. The plaintiff class included those implanted with a heart valve that had not fractured. Those plaintiffs wished to recover for their fear or anxiety that their heart valves might fracture in the future. In its decision approving the proposed settlement, the district court held that these class members might not have had a valid cause of action under applicable tort law. *Id.* at 147–48. Indeed, before the settlement was reached, the defendants had moved to dismiss the claims of these plaintiffs for failure to state a claim upon which relief could be granted. However, because the district court was informed of the settlement negotiations, it delayed ruling on the defendants' motion. *Id.* Ultimately, the court approved the settlement and never ruled on the motion to dismiss.

The *Bowling* court was under a duty, as are all federal courts, to satisfy itself that those plaintiffs with properly functioning heart valves had standing to sue for damages. The fear and anxiety of those plain-

---

**5.** The Honorable Louis C. Bechtle (then Chief Judge) in *Robinson* held that the plaintiff, a prisoner who claimed he was exposed to asbestos while incarcerated, failed to establish that he suffered an injury in fact because he had not been diagnosed with an asbestos-related condition. *Robinson,* 1992 WL 368461, at *2, 1992 U.S.Dist. LEXIS 19518, at *5. Judge Bechtle held this after looking to Pennsylvania tort law under which "mere exposure to asbestos, absent some manifestation of an asbestos-related disease, does not give rise to a cause of action." *Id.,* 1992 WL 368461, at *2, 1992 U.S.Dist. LEXIS 19518, at *4–*5 (citing *Marinari,* 417 Pa.Super. 440, 612 A.2d at 1028). Judge Bechtle also stated that "mere exposure to asbestos in prison, and a prison official's failure to warn about the presence of asbestos, is insufficient as a matter of law to establish a constitutional deprivation." *Id.,* 1992 WL 368461, at *2, 1992 U.S.Dist. LEXIS 19518, at *5.

Given the analysis reflected in this memorandum, I respectfully disagree with Judge Bechtle's holding as to injury in fact and agree with his statement that mere exposure to asbestos cannot give rise to a constitutional claim. Indeed, on an earlier occasion, I reached the merits of a prisoner's claim that he was exposed to asbestos in prison and held that, because he did not suffer from an asbestos-related illness, he failed to establish a constitutional deprivation. *Alim v. Vaughn,* 1992 WL 209918, *2, 1992 U.S.Dist. LEXIS 12503, *4 (E.D.Pa. Aug. 18, 1992).

tiffs along with the medical expenses involved with monitoring their heart valves was enough to satisfy the injury in fact requirement. This is true even though they might not have stated a valid legal claim. And, as long as the plaintiffs had standing to bring their action in federal court, the court had subject matter jurisdiction to decide whether the proposed settlement was fair.[6]

Going beyond the case law, it is easy to understand the logic behind the change from the "legal interest" test to the "injury in fact" test. If federal courts must look to whether plaintiffs in federal court under diversity jurisdiction have stated a valid cause of action in order to find that they have standing to sue in federal court, state law and not federal law would control the scope of Article III standing. Indeed, the same factual injury might be sufficient to confer standing in the federal courts of one state but not in the federal courts of another. Federal standing law, therefore, would not only depend on state law, it would vary from state to state. Because standing is a question of federal constitutional law, *Phillips Petroleum Co.*, 472 U.S. at 804, 105 S.Ct. at 2970, such a lack of uniformity would be undesirable. Also, if a plaintiff had to show a valid cause of action to confer Article III jurisdiction, federal courts could never entertain diversity cases where the existence of the asserted claim under state law was unclear. This is so because standing to sue must clearly exist before a federal court is permitted to reach the merits of a case. Of course, federal courts are often called upon to decide unsettled issues of state law. *See, e.g., Silver v. Mendel*, 894 F.2d 598, 606 (3d Cir.), *cert. denied*, 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990).

Therefore, I conclude that the applicable legal precedent requires that the question of whether the exposure-only plaintiffs have standing to bring this lawsuit in federal court does not depend on whether they have stated a valid cause of action under applica-

ble tort law. The standing analysis does not end here, however. I must still determine whether, pursuant to federal precedent, the harm alleged by the exposure-only plaintiffs, namely exposure to asbestos, constitutes injury in fact which is fairly traceable to the defendants' conduct and is likely to be redressed by a favorable decision.

### 1. Injury in Fact

To satisfy the first requirement of standing, the exposure-only plaintiffs must demonstrate that they have suffered an injury in fact which is concrete and particularized, and actual or imminent rather than merely conjectural or hypothetical. *Lujan*, — U.S. at ——, 112 S.Ct. at 2136. By this the Supreme Court means "that the injury must affect the plaintiff in a personal and individual way." *Lujan*, — U.S. at —— n. 1, 112 S.Ct. at 2136 n. 1. Put another way, "an interest need only be expressible in terms of the individuals's satisfaction or experiences; but such satisfaction or experiences need not be unique to the litigant." L. Tribe, *American Constitutional Law* § 3–16, at 117 (2d ed. 1988) (emphasis omitted).

The severity of the injury is immaterial. The Supreme Court and the Court of Appeals for the Third Circuit have explained that "[t]hese injuries need not be large, an 'identifiable trifle' will suffice." *Public Interest Research Group, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 71 (3d Cir.1990) (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2416 n. 14, 37 L.Ed.2d 254 (1973)), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Indeed, other kinds of non-economic harm have been accepted as Article III injury in fact, including aesthetic harm and emotional distress. *Sierra Club v. Morton*, 405 U.S. 727, 734–41, 92 S.Ct. 1361, 1366–69, 31 L.Ed.2d 636 (1972) (non-quantifiable aesthetic and environmental injuries); *Clayton v. White Hall School Dist.*, 875 F.2d 676, 679

---

6. This is true even though the court stated that it would have granted the defendants' motion to dismiss these plaintiffs' claims had the parties not reached a settlement agreement. Indeed, it is not uncommon for parties to settle before the court rules on a pending motion to dismiss for failure to state a claim upon which relief can be granted. Any question as to whether a plaintiff's claim is cognizable becomes irrelevant once the case has settled.

(8th Cir.1989) (emotional and psychological distress).

In *Duke Power*, the Supreme Court addressed the issue of whether exposure to a toxin is sufficient to confer Article III standing. In that case, the plaintiffs claimed that the future exposure to radiation from two nuclear power plants under construction constituted injury in fact entitling them to challenge the constitutionality of a statute which limited the liability for accidents at nuclear power plants. At the time the suit was brought, the plants were still under construction, and, therefore, plaintiffs had sustained no radiation-related diseases as a result of future emissions. The district court found "immediate" injury to the plaintiffs in "the production of small quantities of non-natural radiation which would invade the air and water" and "a 'sharp increase' in the temperature of two lakes presently used for recreational purposes...." *Duke Power*, 438 U.S. at 73–74, 98 S.Ct. at 2630–31. The Supreme Court agreed that *each* of these effects constituted injury in fact for purposes of Article III standing analysis:

> It is enough that several of the "immediate" adverse effects were found to harm appellees. Certainly the environmental and aesthetic consequences of the thermal pollution of the two lakes in the vicinity of the disputed power plants is the type of harmful effect which has been deemed adequate in prior cases to satisfy the "injury in fact" standard. *And* the emission of non-natural radiation into appellees environment would also seem a direct and present injury, given our generalized concern about exposure to radiation and the apprehension flowing from the uncertainty about the health and genetic consequences of even small emissions like those concededly emitted by nuclear power plants.

*Id.*, at 73–74, 98 S.Ct. at 2630–31 (emphasis added, citations omitted).

The objectors point to language in *Duke Power* which appears to limit its holding on standing. At the beginning of the above-cited paragraph, the Supreme Court cautioned that it:

> need not determine whether all the putative injuries identified by the District Court, particularly those based on the possibility of a nuclear accident and the present apprehension generated by this future uncertainty, are sufficiently concrete to satisfy constitutional requirements. It is enough that several of the "immediate" adverse effects were found to harm appellees.

*Id.*, at 73, 98 S.Ct. at 2630. However, the Court went on to select two of the injuries identified by the district court upon which to base its holding that the plaintiffs did indeed have standing: 1) the environmental and aesthetic consequences of the thermal pollution of the two lakes, and 2) the health and genetic consequences of exposure to small emissions of radiation. *Id.* at 73–74, 98 S.Ct. at 2630–31. Because the settling parties rely on the Court's holding only as to the second injury, I conclude that the Court's failure to rule on the concreteness of the other putative injuries is irrelevant.

Alternatively, the objectors argue that *Duke Power*'s discussion of exposure to radiation as injury in fact is *dictum*. They claim that the Court held that the environmental and aesthetic consequences of thermal pollution constitute sufficient injury in fact while downplaying plaintiffs' future exposure to radiation. In support of this argument, the objectors point out that the first sentence in the Court's holding states that thermal pollution "[c]ertainly" constitutes injury in fact, while the second sentence states only that exposure to radiation "would also seem" to be injury in fact. *Id.* at 73–74, 98 S.Ct. at 2630–31.

■ This argument must also fail. The law of standing requires that a plaintiff allege only one injury in fact, not that all injuries alleged constitute injury in fact. Therefore, in its holding, the Court chose the two injuries which, on their own, would be sufficient injury in fact for purposes of standing. The Court used stronger language when describing its holding as to the environmental and aesthetic injury simply because the law on that issue was clear. In other words, the Court was "certain" about its holding because environmental and aesthetic injury was "the type of harmful effect which has been deemed adequate in prior cases to

satisfy the 'injury in fact' standard." *Id.* at 73–74, 98 S.Ct. at 2630. (citing *SCRAP,* 412 U.S. at 669, 93 S.Ct. at 2407 and *Sierra Club,* 405 U.S. at 734, 92 S.Ct. at 1366). The Court's holding as to the health and/or genetic consequences of exposure was not as easily gleaned from the case law at that time. However, the effect of the Court's ultimate decision that such harm was sufficient to confer Article III standing is no less binding.[7]

Finally, the objectors argue that *Duke Power* is an old case and that Supreme Court decisions concerning standing have become more stringent in the fifteen years since. The objectors claim that since its holding in *Duke Power,* the Supreme Court has added another element to the injury in fact analysis: that the harm be not only concrete and particularized, but also "actual or imminent, not conjectural or hypothetical." *Lujan,* —— U.S. at ——, 112 S.Ct. at 2136; *Whitmore,* 495 U.S. at 155, 110 S.Ct. at 1723; *Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). However, the holding in *Duke Power* is in line with the requirement that the injury be actual or imminent. The Court expressly held that exposure to radiation constituted "direct and present injury[.]" *Duke Power,* 438 U.S. at 74, 98 S.Ct. at 2631. This it held in spite of the fact that the construction of the nuclear power plants was not yet completed. In this case, the exposure-only plaintiffs have already been exposed to a toxin. Thus, even if *Duke Power* represents the most permissive end of the Supreme Court's spectrum of standing decisions, this case still falls within its holding.[8]

Moreover, the objectors' argument that *Duke Power* is no longer good law is odd in the face of the Supreme Court's recent decision in *Helling v. McKinney,* —— U.S. ——, 113 S.Ct. 2475, 125 L.Ed.2d 22 (U.S.1993). In *Helling,* the Supreme Court held that an allegation of intentional exposure of a prisoner to second-hand tobacco smoke, without present injury, states a valid claim for relief under the Eighth Amendment. *Helling* suggests that prisoners exposed to second-hand tobacco smoke may now have a valid cause of action. And, a necessary predicate to the Supreme Court's reaching the merits of the plaintiff's case in *Helling* was the implicit conclusion that mere exposure to second-hand smoke satisfied the injury in fact test of Article III.

Even before *Helling,* other courts had specifically held that exposure to a toxin constitutes injury in fact under Article III. *See, e.g., In re "Agent Orange" Prod. Liab. Litig. (Ivy v. Diamond Shamrock Chemicals Co.),* 996 F.2d 1425 (2d Cir.1993); *Ashton v. Pierce,* 541 F.Supp. 635, 637 (D.D.C.1982), *aff'd,* 716 F.2d 56 and 723 F.2d 70 (D.C.Cir. 1983). Indeed, the Second Circuit's recent decision in the Agent Orange litigation is directly on point here. *Ivy,* 996 F.2d at 1433–35. *Ivy* turned on the effect of the settlement of a prior Agent Orange class action lawsuit in which the class had included "future claimants," that is, persons who had been exposed to Agent Orange but did not yet manifest any disease. Subsequently, several individuals whose disease manifested itself after the settlement filed new lawsuits. In seeking to avoid the binding effect of the class action settlement, they argued that, at the time of the class action, they lacked injury in fact for purposes of Article III standing because they manifested no disease as a result of their exposure to Agent

---

7. This Court previously recognized the dual holdings in *Duke Power:*
 *Cf. Duke Power Co. v. Carolina Environmental Study Group, Inc,* 438 U.S. 59, 73–4, 98 S.Ct. 2620, 2630–31, 57 L.Ed.2d 595 (1978) (Finding that the proximity to a nuclear power plant and the "environmental and aesthetic consequences" of thermal lake pollution *and* exposure to "non-natural radiation" confer standing to assert a Fifth Amendment "taking" claim.)
 *Pearl v. Allied Corp.,* 566 F.Supp. 400, 403 (E.D.Pa.1983) (emphasis added).

8. The objectors also seek to distinguish *Duke Power* as involving a challenge to government action, not a personal injury case. But the objectors cite no authority for their contention that standing is more relaxed for claims against the government than in private litigation. Furthermore, *Duke Power* itself held that there need be no subject-matter nexus between the right asserted and the injury in fact. *Duke Power,* 438 U.S. at 78–80, 98 S.Ct. at 2633–34.

Orange. They argued that, because of their lack of standing, their claims were not within the Article III jurisdiction of the court that approved the class action settlement and, therefore, could not have been settled. *Id.* at 1433–35.

The Second Circuit rejected that argument. It held that " 'some types of injury to the body occur prior to the appearance of any symptoms; thus, the manifestation of the injury may well occur after the injury itself,' " and rejected the argument that " 'injury in fact' means injury that is manifest, diagnosable or compensable." [9] *Id.* at 1434 (citations omitted). Instead, the Second Circuit agreed that the plaintiffs' injury in fact occurred at the time of exposure. *Id.* at 1434 (citing *Duke Power*, 438 U.S. at 74, 98 S.Ct. at 2631).

In another case involving a settlement in an asbestos class action, objectors argued that those members of the class who had not yet manifested an asbestos-related illness did not allege Article III injury in fact. *In re Joint Eastern & Southern Dist. Asbestos Litig. (In re Johns–Manville Corp.)*, 129 B.R. 710, 834 (E. & S.D.N.Y.1991). In response to these objections, the Honorable Jack B. Weinstein held:

> Since asbestos-related illnesses progress over time, the injury can be presumed to have occurred though the victim may not be aware of it.

*Id.* Judge Weinstein found that "[t]he question of whether compensable injury has occurred is not subject to doubt by any court[,]" because latent injury has been recognized throughout the law (including in statutes of limitation decisions, in medical monitoring claims, in bankruptcy proceedings, and in insurance cases). After reviewing various areas of the law regarding the factual injury of asbestos exposure, Judge Weinstein reasoned:

> If persons exposed to asbestos fibers have a sufficient injury to warrant insurance coverage, they must have suffered a quantum of harm adequate to satisfy the constitutional case or controversy minimum injury-in-fact.
>
> . . . .
>
> Early status for Article III standing to be heard is particularly necessary in mass-tort-latent-disease cases. Often settlements and alternate dispute resolution techniques will be instituted even before litigation is threatened to provide protection against a looming storm cloud of future controversies. The courts need to be in a position to intervene as necessary.

*Id.* at 835–36.

Finally, in *Ashton*, the district court held that persons exposed to lead-based paint, but who did not yet manifest disease, had standing because their "alleged exposure to the risk of lead poisoning as a result of the continued presence of lead-based paint in [Washington,] D.C. public housing clearly constitutes a sufficient claim of injury in fact." *Ashton*, 541 F.Supp. at 637 (citing *Duke Power*, 438 U.S. at 74, 98 S.Ct. at 2631). In fact, many federal class action cases have involved a class that included persons who had been exposed to a toxin but manifested no disease. *See, e.g., In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 861 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991) (holding that persons who had been exposed to PCBs could sue for medical monitoring expenses because "regardless of whether all plaintiffs alleged demonstrable physical injury, they all clearly alleged monetary injury"); *In re A.H. Robins Co.*, 880 F.2d 694, 880 F.2d 709 (4th Cir.1989) (affirming district court's settlement of claims by class of persons with potential future injuries caused by use of Dalkon Shield contraceptive device).[10] Although

**9.** Throughout their memoranda, the objectors argue that "injury" in the context of asbestos cases must mean "disease" or "illness." This is not so for purposes of Article III standing. Nowhere in any of the standing cases is there such a limited definition of "injury in fact." The objectors may not, of their own accord, define injury and then claim that the exposure-only plaintiffs do not allege such an injury. Again, in asserting their

Article III injury, the exposure-only plaintiffs rely on their actual exposure to asbestos as well as the resultant medical monitoring expenses, emotional harm, and increased risk of later developing a serious illness.

**10.** *See also Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 147–48 (S.D.Ohio 1992) (approving settlement of emotional distress claims on behalf of a

in many of those cases there is no express finding as to Article III standing, it is clear to me that the courts were satisfied as to their Article III jurisdiction because a finding of such jurisdiction is a necessary predicate to taking action on the merits.

■ Based upon the foregoing analysis, I conclude that exposure to a toxic substance constitutes sufficient injury in fact to give a plaintiff standing to sue in federal court.[11] The objectors do not dispute, nor could they, that asbestos is a toxin. *See In re Joint Asbestos Litig.*, 129 B.R. at 739 ("The capacity of asbestos fibers to cause serious injuries is no longer disputed."). In this case, the class consists of persons who have been exposed to asbestos either occupationally or through the occupational exposure of a spouse or household member. Accordingly, by definition, each class member sues on the basis of *actual* exposure and not future exposure to asbestos. Without more, the exposure-only plaintiffs have alleged sufficient injury in fact.

Apart from the authority dealing with exposure to a toxin as Article III injury in fact, I conclude that the available medical data on the health consequences of exposure to asbestos also require a conclusion that the exposure-only plaintiffs have alleged a demonstrable physical injury which satisfies the Article III injury in fact requirement.

The Pennsylvania Supreme Court recently characterized the immediate consequences of exposure to asbestos as a "direct injury." *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 505–6 (Pa.1993). The court summarized current medical evidence which shows that:

> asbestos fibers in the respiratory tract interact with the membranes of the cells lining the trachea and cause the release of enzymes and superoxides which either damage or kill individual cells. If sufficient cells are damaged, tissue (an accumulation of cells) is damaged or destroyed. This injury occurs within minutes after asbestos fibers enter the cells.

*Id.* The court went on to hold that, for purposes of triggering an insurer's duty to indemnify, "the medical evidence of discrete cellular injuries occurring upon exposure to asbestos justifies the conclusion that exposure to asbestos causes immediate 'bodily injury' . . .", even if disease is not manifested until much later. *Id.* at 506. Judge Weinstein in *In re Joint Asbestos Litig.* agreed:

> Since asbestos-related illnesses progress over time, the injury can be presumed to have occurred though the victim may not be aware of it.

*In re Joint Asbestos Litig.*, 129 B.R. at 834. Thus, to show injury in fact, the exposure-only plaintiffs are not relying on speculative

51,000–person class composed of individuals with "properly functioning . . . heart valves" who feared that these valves might fracture in future), *appeal dismissed without op.*, 995 F.2d 1066 (6th Cir. 1993); *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 60–62 (S.D.Ohio 1991) (the court certified the class based on the class members' actual exposure to radiation and hazardous waste); *In re Fernald Litig.*, 1989 WL 267039, 1989 U.S.Dist. LEXIS 17764 (S.D.Ohio 1989) (approving settlement on behalf of class of persons exposed to radiation from uranium processing plant who had not yet manifested disease); *Pearl*, 566 F.Supp. at 401 (denying motion to dismiss class action complaint of persons exposed to urea formaldehyde insulation, notwithstanding claim that class members suffered no detectible harm).

11. The objectors rely heavily on the Supreme Court's most recent standing decision in *Lujan v. Defenders of Wildlife*, —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In that case,

environmental groups challenged a regulation of the Secretary of the Interior which required other agencies to confer with him under the Endangered Species Act ("ESA") only with respect to federally funded projects in the United States and on the high seas. The plaintiffs claimed that the Secretary erred as to the geographic scope of the ESA's consultation requirement.

The Court held that plaintiffs did not allege sufficient Article III injury in fact because they failed to show that one or more of their members would be directly affected apart from the members' special interest in the subject. Also, the Court explained "that the injury must affect the plaintiff in a personal and individual way." *Lujan*, —— U.S. at —— n. 1, 112 S.Ct. at 2136 n. 1. In this case, the plaintiffs have already been personally exposed to asbestos. Their injury is not speculative as was the injury alleged in *Lujan*, it is actual. I find, therefore, that the Court's holding in *Lujan* supports a finding that the exposure-only plaintiffs have alleged sufficient injury in fact.

future harm, but on their *present* injuries resulting from exposure to asbestos.

In sum, the weight of recognized medical research on asbestos-related diseases shows that exposure to asbestos causes immediate cellular changes. And, only those who have been exposed to asbestos are members of the plaintiff class. They have been personally affected by defendants' conduct in a concrete and particular way whether or not they ever develop a serious medical condition. This is exactly the type of personal stake the Article III injury-in-fact requirement demands. Therefore, I conclude that the exposure-only plaintiffs have alleged Article III injury in fact.

### 2. Traceability

■ The second requirement of standing is that the plaintiff show that there is some causal connection between the injury and the conduct complained of, *i.e.,* the injury has to be fairly traceable to the challenged action of the defendants and not the result of the independent action of some third party. *Lujan,* —— U.S. at ——, 112 S.Ct. at 2136.

■ In their complaint, plaintiffs allege that their injuries are the proximate result of exposure to the CCR defendants' asbestos products. It is clear that they have been exposed to asbestos, and it is clear that the CCR defendants manufactured asbestos and asbestos-containing products.[12] Therefore, I conclude that plaintiffs have shown, for purposes of Article III standing, that their injuries are fairly traceable to the defendants' conduct.

### 3. Redressability

■ To satisfy the final requirement of standing, a federal plaintiff must show that his or her injury is likely to be redressed by a favorable decision. *Lujan,* —— U.S. at ——, 112 S.Ct. at 2136. Because of this requirement, "the form of relief sought is often critical in determining whether the plaintiff has standing." *Brown v. Fauver,* 819 F.2d 395, 400 (3d Cir.1987).[13]

The redressability requirement has been problematic only in cases requesting declaratory or injunctive relief. For example, in *Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), the plaintiff claimed that the Texas policy of not prosecuting the fathers of illegitimate children for failure to pay child support was unconstitutionally discriminatory. The plaintiff, an unwed mother, asked the district court to issue an injunction forcing state officials to prosecute the father of her child. The Supreme Court, however, held that the plaintiff did not have Article III standing to bring the suit. The Court reasoned that an injunction commanding state prosecutions would not ensure that the mother would receive any additional support money. The Court explained that if the plaintiff "were granted the requested relief, it would result only in the jailing of the child's father. The prospect that prosecution will ... result in payment of support can, at best, be termed only speculative." *Id.* at 618, 93 S.Ct. at 1149. In other words, the plaintiff lacked standing because her injury was not likely to be redressed by the relief she requested.

Similarly, in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), several plaintiffs challenged the constitutionality of a suburb's exclusionary zoning practices. They claimed that the zoning practices prevented construction of multifamily dwellings and low-income housing and, therefore, effectively excluded them from the neighborhood. The Supreme Court held that these plaintiffs lacked standing because they could not demonstrate that appropriate housing would be constructed without the exclusionary zoning ordinances. The Court felt that overturning the zoning ordinances would not guarantee that builders would choose to construct new housing in the area, or that low-income residents would be able to afford to live there. *Id.* at 505–07, 95 S.Ct. at 2208–09; *see also Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 45–46, 96 S.Ct. 1917, 1928, 48 L.Ed.2d 450 (1976).

---

**12.** The objectors do not dispute that this requirement has been satisfied.

**13.** The objectors offer no argument that the money damages sought in the complaint would not redress the injuries of the exposure-only plaintiffs.

 In this case, it is self-evident that the very conventional remedy sought by the plaintiffs—money damages—would do much to redress their injuries. Unlike claims for injunctive or declaratory relief, as in the above-cited cases, "[a] damage claim, by definition, presents a means to redress an injury." *Cardenas v. Smith*, 733 F.2d 909, 914 (D.C.Cir.1984). Therefore, I conclude that the exposure-only plaintiffs have shown that their injuries are likely to be redressed by the relief requested in their complaint.

#### 4. Conclusion

 The exposure-only plaintiffs have satisfied the three requirements of Article III standing. Beyond that, a reexamination of the policies served by the standing requirement convinces me of the propriety of this finding. *See* Memorandum, *supra* at 5–6. First, this is not a case where the courts are being "called upon to decide abstract questions of wide public significance ..." *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206. Here, the plaintiffs have particular, concrete and individual claims of injury. That there are many victims of asbestos does not change the individual and personal stake each plaintiff has in the outcome of this litigation. Judicial intervention is, therefore, appropriate and necessary.

Second, this case provides the type of factual setting which is necessary for judicial review to be effective. Because the claims of the exposure-only plaintiffs are based on their personal experiences and involve particularized concrete injuries, there is no risk of ruling on an ill-defined or abstract controversy.

Finally, the exposure-only plaintiffs have been directly affected by the CCR defendants' conduct. They are not merely concerned bystanders. Therefore, this case serves the Article III policy of reserving the federal courts for parties whose lives will be directly affected by the outcome of specific litigation.

Having reviewed the applicable case law and the Article III policies which have guided the courts in their decisions, it is clear to me that the claims of the exposure-only plaintiffs are precisely the type which confer

standing to sue in federal court. I conclude, therefore, that the exposure-only plaintiffs have Article III standing to bring this lawsuit.

#### B. Diversity Jurisdiction—Amount in Controversy

 The plaintiff class seeks to invoke the subject matter jurisdiction of this Court based on the federal diversity statute, 28 U.S.C. § 1332. That statute authorizes federal courts to exercise subject matter jurisdiction over actions "between citizens of different States" so long as "the matter in controversy exceeds the sum or value of $50,-000, exclusive of interest and costs." 28 U.S.C. § 1332. In class actions, each class member must on his or her own meet the amount in controversy requirement. *Zahn v. International Paper Co.*, 414 U.S. 291, 301, 94 S.Ct. 505, 512, 38 L.Ed.2d 511 (1973).

 For purposes of measuring the amount in controversy, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). The case cannot be dismissed for failure to exceed the requisite amount in controversy unless it "appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount ..." *St. Paul Mercury Indem. Co.*, 303 U.S. at 289, 58 S.Ct. at 590; *accord In re School Asbestos Litig.*, 921 F.2d 1310, 1315 (3d Cir.1990) ("the court is required only to dismiss those class members whose claims appear to a 'legal certainty' to be less than the jurisdictional amount"). Only such a showing can overcome the presumption that the plaintiff has, in good faith, properly alleged the requisite amount. *See Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 353, 81 S.Ct. 1570, 1573, 6 L.Ed.2d 890 (1961); 1 J. Moore, Moore's Federal Practice ¶ 0.92[1], at 829 & n. 9 (2d ed. 1992); 14A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3702, at 54–56 (2d ed. 1985). Thus, although the plaintiff has the burden of proving the requisite amount in controversy, in practice, this burden "is not a heavy one.... [T]he plaintiff need only present

allegations or proof that it is *not* clear to a legal certainty that [s/he] will not recover less than the jurisdictional amount." Moore, *supra*, at 831 (citations omitted, emphasis in original).

The amount in controversy is judged as of the time of filing the complaint, and subsequent events will defeat jurisdiction only if they show that the plaintiff lacked a good faith basis for claiming over $50,000 at the time the complaint was filed. *Id.* 303 U.S. at 288–90, 58 S.Ct. at 590–91; *see also Nationwide Mutual Fire Ins. Co. v. T & D Cottage Auto Parts and Service, Inc.,* 705 F.2d 685, 687 (3d Cir.1983). Thus, "[t]he inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his [or her] bad faith or oust the [court's] jurisdiction. Nor does the fact that the complaint discloses the existence of a valid defense to the claim." *St. Paul Mercury Indem. Co.,* 303 U.S. at 289, 58 S.Ct. at 590 (citations omitted); *accord Apicella v. Valley Forge Military Academy and Junior College,* 630 F.Supp. 20, 24 (E.D.Pa.1985). Likewise, a verdict or settlement for less than the jurisdictional amount does not undermine the court's jurisdiction. Moore, *supra*, at 834 (events "such as dismissal or compromise of claims . . . do not affect jurisdiction").

In determining the amount in controversy, claims for punitive damages generally must be included in the computation. *See, e.g., Bell v. Preferred Life Assur. Soc'y,* 320 U.S. 238, 240, 64 S.Ct. 5, 6, 88 L.Ed. 15 (1943). A claim for punitive damages may be "stricken from the amount in controversy" only if it is " 'patently frivolous and without foundation' because such damages are unavailable as a matter of law." *Packard v. Provident National Bank,* 994 F.2d 1039, 1046 (3d Cir.1993) (citation omitted).

The plaintiffs allege that jurisdiction is based upon diversity of citizenship and an amount in controversy for each member of the plaintiff class which exceeds $100,000.

The objectors, on the other hand, argue that the exposure-only plaintiffs cannot in good faith allege damages in excess of the jurisdictional minimum.[14]

Applying the legal principles discussed above, courts in class action personal injury cases seeking unliquidated damages have uniformly held that it cannot be said to a "legal certainty" that any class member's claim is for less than the jurisdictional amount. For example, in the class action brought on behalf of asbestos personal injury plaintiffs against the Manville Settlement Trust, both Judge Weinstein and the Second Circuit rejected the argument that some members of the class did not meet the amount in controversy requirement, even though the class included those who had not yet manifested an asbestos-related condition, and even though the settlement imposed a cap on some claimants below the $50,000 level. *In re Joint Asbestos Litig.,* 129 B.R. at 793–94, 982 F.2d at 734. The class in that case consisted of "all beneficiaries of the [Manville] Trust who now have *or in the future may have* (a) any unliquidated claims for death or injury resulting from exposure to Manville asbestos. . . ." 982 F.2d at 729 (emphasis added). Nevertheless, Judge Weinstein, relying on his own experience and on cases from other courts, took "judicial notice of the fact that the value of every claim in the complaint can in good faith be said to exceed $50,000 for the purpose of pleading." 129 B.R. at 793–94. Also, under the proposed stipulation of settlement— which was filed simultaneously with the complaint—the maximum possible award to certain kinds of claimants was $30,000. 982 F.2d at 730. With respect to the settlement cap, Judge Weinstein noted that "[w]hile any plaintiff is free to settle a claim for less than the amount sought in the complaint, the amount that controls for jurisdictional purposes is what the claimant in good faith pleads." 129 B.R. at 793. On appeal, the Second Circuit summarily rejected the challenge to these rulings, specifically agreeing that the settlement cap below $50,000 did not

---

14. There is no dispute as to the diversity of citizenship of the named parties. Also, the objectors concede, and I agree, that the claims of

those members of the plaintiff class who already manifest an asbestos-related condition satisfy the jurisdictional minimum of 28 U.S.C. § 1332.

affect the Court's jurisdiction. 982 F.2d at 734.

The same conclusions have been reached in other class action product liability cases. The Second Circuit twice rejected an amount in controversy challenge in the Agent Orange litigation, even though (1) the class included "future claimants," *i.e.*, those who did not yet manifest a disease as a result of exposure to Agent Orange, and (2) the settlement provided no payment to many members of the class. *Ivy*, 996 F.2d at 1434; *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 157–58, 163 (2d Cir.1987). In the *Ivy* case, several class members who were classified as "future claimants" when the initial class action was settled in 1984 asserted that they had subsequently suffered injury as a result of their Agent Orange exposure and that they were not bound by the 1984 class action settlement. As with the standing issue, the *Ivy* plaintiffs argued that they could not be bound by the original settlement on the theory that their individual claims in 1984 (for not-yet manifested conditions) could not have satisfied the amount in controversy requirement. The Second Circuit disagreed, holding that it did not appear to a legal certainty that the claims of the plaintiff class, including the claims of the exposure-only plaintiffs, were really for less than the jurisdictional amount.

Likewise, in a case involving the drug DES, a district court certified a class of women who had been exposed to DES *in utero* but had not developed cancer. The court rejected a challenge to the jurisdictional amount requirement as follows:

> Plaintiffs' claimed damages are unliquidated and subject to a jury's evaluation of many subjective factors. I cannot now find to a legal certainty that the claim of any member of the plaintiff class is less than the jurisdictional amount.

*Payton v. Abbott Labs*, 83 F.R.D. 382, 395 (D.Mass.1979), *vacated on other grounds*, 100 F.R.D. 336 (D.Mass.1983).

Similarly, in the Dalkon Shield litigation, the certified class included women "who had used the Dalkon Shield but had not yet manifested an injury" from that use.[15] *In re A.H. Robins Co.*, 88 B.R. 742, 745 (E.D.Va.1988). Nevertheless, the Fourth Circuit rejected a challenge to the amount in controversy, noting that such personal injury claimants always sought an amount in excess of the jurisdictional amount and holding that it is "indisputable that it cannot be said to a 'legal certainty' that the jurisdictional amount herein was not satisfied." *In re A.H. Robins Co.*, 880 F.2d 709, 723–25 (4th Cir.1989).

Finally, in the *Bowling* case discussed above, the court, in approving a class action settlement, rejected the argument that not all members of the plaintiff class met the $50,000 requirement, even though the heart valves implanted in several of the class members were, at the time of settlement, still functioning properly. The court stated that, "[a]lthough it is unlikely that the Plaintiffs would have made it to trial and then prevailed, had they done so, the Plaintiffs can assert in good faith that they would have received more than $50,000 each from a jury." *Bowling*, 143 F.R.D. at 167. This the court held even though, had the parties not settled, the claims of these plaintiffs would probably have been dismissed for failure to state a claim upon which relief could be granted.

The objectors argue that in spite of the holdings in the above-cited cases the exposure-only plaintiffs in this case have not met the amount in controversy requirement: (1) without a presently diagnosed asbestos-related condition, the exposure-only plaintiffs only have a cause of action for medical monitoring, if anything, and hence cannot recover more than $50,000, and (2) the proposed settlement itself shows that the amount in controversy does not exceed $50,000.[16]

---

15. Although this quotation directly referred to the bankruptcy claimants, the class in the class action was defined to include those claimants. *See In re A.H. Robins Co.*, 85 B.R. 373, 378 (E.D.Va.1988); *see also In re A.H. Robins Co.*, 880 F.2d 709, 717 (4th Cir.1989).

16. The objectors also attempt to distinguish many of the above-cited cases on the ground that, in those cases, "each of the *named plaintiffs* specifically alleged that they had sustained physical injury as a result of the defendant's conduct." Baron Brief at 37 (emphasis added). That argument fails because (1) the amount in controversy

I do not find it necessary to make a claim-by-claim analysis of the causes of action available to diversity plaintiffs in order to determine whether the plaintiffs have alleged the jurisdictional minimum. I conclude that it is enough that the kind of factual injuries alleged by the exposure-only plaintiffs—physical, monetary, and emotional injuries—plainly support a claim to more than $50,000. The *Manville Trust, Agent Orange, DES, Dalkon Shield,* and *Heart Valve* cases discussed above included persons who had been exposed to the hazardous substance or product but manifested no compensable disease or condition, and the courts nonetheless found that the plaintiffs all met the jurisdictional minimum. None of those courts found it necessary or appropriate to make a detailed examination of the causes of action available to such persons for purposes of the jurisdictional amount requirement.

■ Even those claims that would not be recognized under applicable law must still be counted for jurisdictional purposes. This is evident from the recent Third Circuit decision in *Angus v. Shiley, Inc.,* 989 F.2d 142 (3d Cir.1993). In that case, the plaintiff alleged that she was suffering extreme anxiety and emotional distress as a result of learning that her implanted heart valve, which had been manufactured by the defendant, might fracture in a fashion that could cause death or serious injury. Her suit seeking compensatory damages for emotional distress and punitive damages was brought in Pennsylvania state court and removed by defendant to federal district court. The district judge rejected plaintiff's motion to remand the case to state court and dismissed the case on the merits for failure to state a claim.[17]

On appeal, the plaintiff first contended that the district court had lacked diversity jurisdiction because her claims did not satisfy the amount in controversy requirement. The Third Circuit rejected this contention:

> Given that the complaint does not limit its request for damages to a precise monetary amount, the district court properly made an independent appraisal of the value of the claim, ... and reasonably found that the actual amount in controversy exceeded $50,000 *for there can be no doubt that a reasonable jury likely could have valued Angus' losses at over $50,000.*

*Id.* at 146 (footnote omitted, emphasis added). Turning to the merits, the court upheld the dismissal of Angus' complaint for failure to state a claim, finding that Pennsylvania would not allow a cause of action for emotional distress under the circumstances. *Id.* at 147.

With its decision in *Angus,* the Third Circuit in essence held that claims for damages for emotional distress in product liability cases should be included in determining whether the jurisdictional amount is met, even when those claims ultimately must be dismissed for failure to state a valid claim.[18] *See also Bowling,* 143 F.R.D. at 167. The settling parties argue that the "lesson" from *Angus* was in fact required by the general rule that a court does not lose jurisdiction even when "the complaint discloses the existence of a valid defense to the claim." *St. Paul Mercury Indem. Co.,* 303 U.S. at 289, 58 S.Ct. at 590.[19]

Alternatively, even if a claim-by-claim examination is necessary, the exposure-only plaintiffs have alleged a cognizable claim for

requirement applies to class members as well as to class representatives, *Zahn,* 414 U.S. at 301, 94 S.Ct. at 512, and (2) in this case, the plaintiffs, including those with no manifested asbestos-related condition, do allege physical injury as a result of exposure to defendants' products—adverse cellular changes.

17. The district judge termed its dismissal as a grant of summary judgment, but the Third Circuit ruled that its action was properly characterized as a dismissal. *Angus,* 989 F.2d at 146–47.

18. *Angus* cannot be distinguished on the ground that it is a heart valve case and this is an asbestos

case. The availability of damages for emotional distress obviously does not turn on the type of product involved. In fact, *Angus* expressly relied upon asbestos cases in deciding that the case should be dismissed.

19. The claims in the present case are far stronger than the claims that were counted in computing the amount in controversy (but then dismissed) in *Angus,* given that the plaintiffs here allege that the asbestos products to which they were exposed were defective (Complaint at ¶ 46) and that they suffer physical injury from that exposure (Complaint at ¶ 41).

medical monitoring and punitive damages. On this point most of the objectors concede, and I agree, that the claim for medical monitoring is not frivolous. Those objectors assert, however, that damages for medical monitoring cannot exceed approximately $500 per year, or approximately $10,000 per claimant.

But the plaintiffs also seek punitive damages. As noted above, claims for punitive damages must be counted in determining whether the jurisdictional amount has been satisfied unless they are "patently frivolous and without foundation." *Packard,* 994 F.2d at 1046. Conceding this, one of the objectors contends that punitive damages are not available at all when only medical monitoring damages can be sought, arguing that:

> there is *no* authority to suggest that the 'exposure only' plaintiffs' nominal claims for medical surveillance—without more—would support an award of punitive damages. Indeed, it appears that no court in any jurisdiction has ever upheld such an award. Accordingly, the punitive claims must be stricken from the amount in controversy.

Brief of the law firm of Baron & Budd ("Baron Brief") at 33 (emphasis in the original). The objectors suggest, in effect, that if no known or reported decision has upheld an award of punitive damages in such circumstances, I must conclude to a "legal certainty" that punitive damages could never be awarded. This, however, is not the law. The "legal certainty" test requires that such a claim be *unavailable* as a matter of law. *Packard,* 994 F.2d at 1046. In other words, controlling adverse precedent is required to show that a claim would certainly fail.

In any event, it is not uncommon for plaintiffs to join claims for punitive damages with claims for medical monitoring.[20] The potential substantiality of such claims is shown by *In re Fernald Litig.,* 1989 WL 267039, 1989 U.S.Dist. LEXIS 17764 (S.D.Ohio 1989).

There the court approved a class action settlement of claims brought by owners of property adjacent to a nuclear facility and certain current and former employees of the facility. In evaluating the settlement, the court noted that, to facilitate settlement, it had conducted an advisory summary jury trial in which the non-binding verdict included "$1,000,000 for diminution of property values, $80,000,000 for a medical monitoring fund, and $55,000,000 for punitive damages." *Id.,* 1989 WL 267039, at *2, 1989 U.S.Dist. Lexis 17764, at *4.

I distinguish *Linkous v. Medtronic, Inc.,* 1985 WL 2602 (E.D.Pa. Sept. 4, 1985), upon which the objectors rely in support of their claim that the exposure-only plaintiffs cannot add punitive damage claims to medical monitoring claims in order to meet the jurisdictional minimum. In *Linkous,* the plaintiffs sought to certify a separate class for punitive damages claims. The court ruled that the class in that case failed to meet the requirements for certification. *Id.,* at *8. In light of that ruling, the court also held that the amounts sought in punitive damages could not be used to establish that the plaintiffs in the remaining two classes met the jurisdictional amount requirement. *Id.,* at *4, *7. Here, by contrast, the class itself includes plaintiffs' claims for both compensatory *and* punitive damages, which thus are both counted in deciding the jurisdictional amount issue.

The objectors also contend that punitive damages could not be awarded in a sufficient amount to exceed $50,000 when combined with the award for medical monitoring damages because "in Pennsylvania punitive damages must be reasonably related, and not disproportionate, to the amount of compensatory damages." Baron Brief at 31–32. The objector's argument mistakenly invokes the law of only one state, and also misstates that law. This is a nationwide class action in diversity jurisdiction, and the class members' claims are subject to the laws of the various states, not just Pennsylvania. In any event,

---

**20.** *See, e.g., Day v. NLO, Inc.,* 814 F.Supp. 646 (S.D.Ohio 1993); *Cook v. Rockwell Int'l Corp.,* 755 F.Supp. 1468 (D.Colo.1991); *Catasauqua Area School Dist. v. Raymark Indus., Inc.,* 662 F.Supp. 64 (E.D.Pa.1987). Punitive damages have also been awarded in connection with other

"exposure-only" claims. *See, e.g., Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188 (6th Cir.1988) (lower court awarded $7.5 million in punitive damages along with substantial damages for fear of cancer).

this Court recently noted in applying Pennsylvania law that "punitive damages need not bear a reasonable relationship to compensatory damages." *Fine v. State Farm Fire & Cas. Co.*, 1993 WL 196888, *1, 1993 U.S.Dist. LEXIS 7682, at *4 (E.D.Pa. June 11, 1993) (citing *Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 555 A.2d 800 (Pa.1989)). And, in light of the recent Supreme Court decision of *TXO Production Corp. v. Alliance Resources Corp.*, — U.S. —, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), where a punitive award 526 times greater than the compensatory award was upheld, it cannot be argued with legal certainty that the Constitution imposes any requirement that punitive damages bear a reasonable relationship to compensatory damages. In short, there is no mathematically certain limit on the amount of punitive damages that might be awarded to the plaintiffs in this case.

In fact, there have been many large punitive damage awards in prior asbestos cases. Just recently, a majority of the Third Circuit, sitting en banc, approved a $1 million award of punitive damages on behalf of a single plaintiff against a former manufacturer of asbestos-containing insulation. *Dunn v. HOVIC*, 1 F.3d 1371, 1383 (3d Cir.1993). In so doing, the court noted that:

> "[a] multi-million dollar punitive damages award is not unique in products liability cases. See, e.g., *Glasscock v. Armstrong Cork Co.*, 946 F.2d 1085 (5th Cir.1991) ($6.1 million in asbestos case); ... *Cathey v. Johns–Manville Sales Corp.*, 776 F.2d 1565 (6th Cir.1985) ($1.5 million in asbestos case)...."

*Id.* at 1383.[21]

The objectors rely heavily on *Packard v. Provident Nat'l Bank*, 994 F.2d 1039 (3d Cir.1993), for their argument that the exposure-only plaintiffs cannot satisfy the jurisdictional minimum with their claims for medical monitoring and punitive damages. In

*Packard*, the plaintiffs sought recovery of quantifiable "sweep fees" that defendant trustee banks had charged to trusts. Those liquidated sums were far less than $50,000 per class member, with the named plaintiff seeking recovery of only about $4,000 in such fees. *Id.* at 1046. This case, however, is much different. The complaint here seeks unliquidated damages that would be subject to a jury's subjective evaluation. It cannot be said with legal certainty that a jury would not award the exposure-only plaintiffs unliquidated, compensatory damages and punitive damages for medical monitoring in excess of the jurisdictional amount. In other words, *Packard* dealt only with the counting of punitive damages where the compensatory damages were liquidated at a level far less than $50,000. The *Packard* holding does not apply to cases like this one where the plaintiffs seek unliquidated compensatory damages.

Furthermore, because the level of liquidated compensatory damages in *Packard* was so low, the plaintiffs were necessarily trying to satisfy the jurisdictional amount almost entirely through their punitive damages claim. The court stated that "when it appears that [a punitive damages] claim comprises the bulk of the amount in controversy and may have been colorably asserted solely or primarily for the purpose of conferring jurisdiction, that claim should be given particularly close scrutiny." *Id.* at 1046. The court then examined whether plaintiffs in *Packard* could possibly state a viable claim for punitive damages under Pennsylvania law and concluded that that law foreclosed the award of punitive damages against a trustee.[22] *See Id.* at 1047–49. It accordingly determined that there was a legal certainty that the plaintiffs' claims in that case could not satisfy the jurisdictional amount and it ordered that the action be dismissed. *Id.* at 1050.

---

**21.** As examples of other substantial awards of punitive damages in asbestos litigation, *see Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277 (2d Cir.) ($2,300,000 in punitive damages), *cert. dismissed*, 497 U.S. 1057, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990); *Johnson v. Celotex Corp.*, 899 F.2d 1281 (2d Cir.) ($3,000,000 in punitive damages), *cert. denied*, 498 U.S. 920, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990); *Eagle–Picher In-*

*dus., Inc. v. Balbos*, 326 Md. 179, 604 A.2d 445 (Md.1992) ($150,000 in punitive damages).

**22.** *Packard* also differs from this case in that only Pennsylvania law applied to the plaintiffs' cause of action. In this case, as mentioned above, the laws of the various states apply.

It cannot be said in this case that punitive damages are unavailable as a matter of law. Nor can it be said with legal certainty that there is a strict mathematical limit on the amount of such damages that might be awarded. *See, e.g., Fine,* 1993 WL 196888, at *1, 1993 U.S.Dist. LEXIS 7682, at *3 n. 2 (without commenting on the ultimate merits of plaintiffs' claim for punitive damages, the court noted that, from the face of the complaint, it was not patently frivolous and thus could be considered in assessing the amount in controversy).

In light of the foregoing I find that, even if only the claims for medical monitoring and punitive damages are considered, the exposure-only plaintiffs' claims exceed the jurisdictional minimum. In other words, I cannot find to a legal certainty that a jury could not award the exposure-only plaintiffs more than $50,000 in compensatory and punitive damages on their medical monitoring claims.

The objectors' second contention is that the terms of the proposed settlement show that the exposure-only plaintiffs do not meet the jurisdictional amount because they will receive no immediate monetary payment. However, the "amount of settlement is often less than the amount the plaintiff expects to receive *if* he or she prevails at trial." *Bowling,* 143 F.R.D. at 167. For that reason, as noted above, it is clear that a settlement for less than the jurisdictional amount does not undermine the court's jurisdiction. I find that this rule applies as well where the proposed settlement is filed at the same time as the complaint—as occurred in the *Manville* case. It also applies even if the settlement provides some class members with *no* immediate monetary relief—as was true in the *Agent Orange* and *Manville* cases.

It is widely known that asbestos personal injury claimants invariably seek—and often obtain—damages well in excess of $50,000. Therefore, there is no basis on which to conclude that the damage calculation was inflated here to create federal jurisdiction. Because the "[p]laintiffs' claimed damages are unliquidated and subject to a jury's evaluation of many subjective factors," *Payton,* 83 F.R.D. at 395, I conclude that it is impossible to establish "to a legal certainty" that

the claims of the exposure-only plaintiffs are for less than the jurisdictional amount. Therefore, I necessarily conclude that the plaintiff class has satisfied the amount in controversy requirements of 28 U.S.C. § 1332.

## C. Collusion

 Because of the "case or controversy" requirement in Article III, "federal courts will not entertain friendly suits, or those which are feigned or collusive in nature." *Flast,* 392 U.S. at 100, 88 S.Ct. at 1953. The Constitution demands a "honest and actual antagonistic assertion of rights." *United States v. Johnson,* 319 U.S. 302, 305, 63 S.Ct. 1075, 1077, 87 L.Ed. 1413 (1943) (quoting *Chicago & Grand Trunk R. Co. v. Wellman,* 143 U.S. 339, 345, 12 S.Ct. 400, 402, 36 L.Ed. 176 (1892)). "[I]f two litigants commence a suit with the same goals in mind, no controversy exists to give the district court jurisdiction[.]" *Pennsylvania Ass'n for Retarded Children v. Pennsylvania,* 343 F.Supp. 279, 290 (E.D.Pa.1972).

 The objectors argue that this class action is collusive, or "friendly," because (1) the complaint and the proposed settlement were filed simultaneously, and (2) a provision of the proposed settlement provides that the CCR defendants will pay class counsel's fees.

Throughout the years, allegations of collusion have defeated a district court's jurisdiction in cases very different from this personal injury action for damages. In *Johnson,* for example, a landlord sought to invalidate the rent controls in the Emergency Price Control Act of 1942 by requesting that his tenant bring an action against him under the Act seeking treble damages for excessive rent. Notwithstanding the tenant's presence as the nominal plaintiff, the landlord controlled the suit and paid the tenant's attorney's fees. Because of the lack of adverse parties and the collusive nature of the suit, the Supreme Court held that action must be dismissed. *Johnson,* 319 U.S. at 305, 63 S.Ct. at 1077; *see also Moore v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 47, 91 S.Ct. 1292, 28 L.Ed.2d 590 (1971) (both parties to the lawsuit jointly sought a judicial

determination that an anti-busing statute was unconstitutional); *Wellman,* 143 U.S. at 344, 12 S.Ct. at 402 (Court condemned "a friendly suit between the plaintiff and the defendant to test the constitutionality of [a particular piece of] legislation").

In *Teamsters Local 513 v. Wojcik,* 325 F.Supp. 989 (E.D.Pa.1971), the district court dismissed for lack of subject matter jurisdiction a declaratory judgment action brought by a union against a union official who had been convicted of possessing narcotics. The purpose of the suit was to determine whether the official could still serve, despite a federal law disallowing anyone convicted of a violation of the narcotics laws from serving as an officer of a labor organization. Because both parties wished to preserve the official's position in the union unless the statute required otherwise, the court held that "there is no 'controversy' between them on that point because their interests are not adverse." *Id.* at 991.

The objectors argue that this suit is analogous to those cited above because the parties are no longer adverse as they settled their differences before filing the complaint. They argue that the simultaneous filing of the complaint and the proposed settlement leaves the Court with no choice but to find that this suit is "friendly." This is so, they argue, because to present a justiciable controversy, the parties must be genuinely adverse *when the suit is filed.*

On this point, the objectors cite to this Court's earlier decision in *Pennsylvania Ass'n for Retarded Children,* 343 F.Supp. at 290. In that case, an association of parents of retarded children brought a class action against the Commonwealth of Pennsylvania and thirteen individual school districts claiming that the exclusion of retarded children from the Pennsylvania public schools was unconstitutional. The plaintiffs added all other school districts in Pennsylvania as unnamed class defendants. The plaintiffs and representative defendants ultimately reached a settlement of the action and presented the

proposal to the court for approval under Fed.R.Civ.P. 23. One unnamed school district objected, claiming that the court lacked jurisdiction over the class action because the plaintiffs and the defendants were not sufficiently adversarial. Rejecting that argument, the court observed:

> Undoubtedly, if two litigants commence a suit with the same goals in mind, no controversy exists to give the district court jurisdiction as required by Article III, Sec. 2. But a different case arises when litigants *begin* a suit as adversaries and then at some later point decide to compromise the dispute. In such an instance, the court does not *ipso facto* lose jurisdiction over the matter for want of a controversy.

*Id.* at 290 (emphasis in original, citations omitted). In finding its jurisdiction intact, the court stated that "[t]he record in this case clearly shows that the Commonwealth did not collaborate with the plaintiffs in bringing or conducting this suit." *Id.* at 291.

The settling parties do not dispute that this class action was settled before the complaint was filed. They claim, however, that the CCR defendants, as asbestos manufacturers, and the plaintiffs, as asbestos victims, have diametrically opposed legal interests in this lawsuit just as they have throughout the twenty-year history of asbestos litigation. The settling parties claim, and the objectors do not dispute, that the negotiations leading to the proposed settlement were long, arduous, complex and arms-length. This type of controversy, the settling parties argue, is the opposite of the type banned from the federal courts for lack of a genuine dispute.

The recent decisions in *In re Joint Asbestos Litig.* support the argument that pre-filing negotiations do not evidence a "friendly" lawsuit. In that case, the complaint was filed on the same day as the proposed settlement. 982 F.2d at 728. Neither Judge Weinstein nor the Second Circuit saw any problem with the justiciability of the lawsuit resulting from that fact.[23] Also, other feder-

---

**23.** At the August 23, 1993 hearing, the objectors attempted to distinguish *In re Joint Asbestos Litig.* by pointing out that Judge Weinstein was aware of the ongoing negotiations between the parties and that the simultaneous filing of the complaint and the settlement was done with his consent. However, a district judge cannot create subject matter jurisdiction if no case or contro-

al courts have held that the simultaneous filing of the complaint and the proposed settlement does not show a collusive suit or undermine the court's jurisdiction. *SEC v. Randolph,* 736 F.2d 525 (9th Cir.1984); *Rodgers v. United States Steel Corp.,* 536 F.2d 1001 (3d Cir.1976); *United States v. Allegheny–Ludlum Indus., Inc.,* 517 F.2d 826 (5th Cir.1975); *United States v. TW Servs., Inc.,* 1993 U.S.Dist. LEXIS 7882 (N.D.Cal. Apr. 1, 1993); *Colorado Environmental Coalition v. Romer,* 796 F.Supp. 457, 458 (D.Colo.1992); *West Virginia ex rel. Tompkins v. Coca–Cola Bottling Co.,* 1990 WL 17541, 1990 U.S.Dist. LEXIS 5304 (S.D.W.Va. Jan. 16, 1990); *United States v. Acton Corp.,* 131 F.R.D. 431 (D.N.J.1990).[24]

In *SEC v. Randolph,* 564 F.Supp. 137 (N.D.Cal.1983), *rev'd,* 736 F.2d 525 (9th Cir. 1984), the Securities and Exchange Commission ("SEC") filed a complaint against two alleged insider traders. Before actually filing the complaint in federal court, however, the SEC and the defendants had worked out a consent decree wherein the defendants, without conceding liability, agreed to disgorge the profits of their allegedly improper transactions. In accordance with the settlement agreement, on the same day the complaint was filed, proposed judgments incorporating the terms of the settlement agreement were also filed. The district court held that there existed no case or controversy because the parties had come to court only after they had agreed to a settlement and, thus, were no longer adverse at the time the complaint was filed. *Id.* at 144. The district court reasoned:

> Although cast in the form of a lawsuit, the proceedings in this case resemble a negotiated arrangement between private parties.

The Court's first involvement with the case came when the parties presented it with a completed agreement and, in effect, asked the Court to rubber stamp it. The case was essentially over by the time the parties appeared in court. Under the circumstances, the Court questions whether there is a sufficient controversy here to justify invocation of the Court's jurisdiction under Article III of the Constitution. Even if there was once a controversy, it appears to have disappeared before the SEC filed its complaint. This is not a "collusive" lawsuit in the usual sense, because the parties' interests were certainly opposed when they began negotiating. But by the time they came to court, they were in agreement.

*Id.* The district court also stated that any settlement agreement between the SEC and the defendants could be enforced on normal contract principles and, thus, did not need court approval.

■■■ On appeal, the Ninth Circuit reversed the holding of the district court as to whether there existed an Article III case or controversy. *SEC v. Randolph,* 736 F.2d 525, 528 (9th Cir.1984). The court held that because the consent decree called for prospective relief, the controversy was not mooted by the decree. The court also held that the district court "neglect[ed] the contingent nature of the proposed decree" when it held that the settlement agreement could stand alone. *Id.* Judicial approval of the consent decree was necessary to make it binding on the parties. *Id.* (citing *Carson v. American Brands, Inc.,* 450 U.S. 79, 87, 101 S.Ct. 993, 998, 67 L.Ed.2d 59 (1981)). In support of its holding, the court stated that the use of the

versy exists. If I can assume that Judge Weinstein "consented" to the filing of the complaint and the settlement, I can also assume he did so fully satisfied that the parties were not "friendly."

**24.** The objectors attempt to distinguish these cases as involving the enforcement of public rights by a governmental agency (or a party standing in the shoes of a governmental agency) through proposal of a consent decree, and not the resolution of private claims for compensation through a settlement stipulation. The objectors point to language from two consent decree cases

holding that the pre-filing settlements had not mooted the controversy because the settlements called for prospective relief in the form of injunctions. *Randolph,* 736 F.2d at 528 (citing *Swift & Co. v. United States,* 276 U.S. 311, 325–26, 48 S.Ct. 311, 314–16, 72 L.Ed. 587 (1928) (dictum)). However, this case also calls for prospective relief in the form of a class action settlement. Such settlements require judicial approval, and once approved, take the form of consent judgments which, like injunctions, may be enforced by judicial proceedings. Therefore, I find these cases to be directly on point.

consent decree is efficacious because it "encourages informal resolution of disputes, thereby lessening the risks and costs of litigation." *Id.*

The facts in *Randolph* are similar to the facts of this case. The parties negotiated the settlement in that case before filing the complaint, but they needed court approval of the settlement for it to be binding as a judgment. Also, the consent decree called for prospective relief. The settlement agreement in this class action also requires judicial approval pursuant to Fed.R.Civ.P. 23 to become binding on the parties, and it calls for both prospective relief, including ongoing adversary claims and relationships. Indeed, if not for the Rule 23 requirement, this case would have been mooted by the settlement agreement, and, as the objectors claim, there would be no case or controversy. However, a case does not become moot when, as in this case and *Randolph*, the parties reach a proposed settlement that is contingent on the approval of the court. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 371 n. 10, 102 S.Ct. 1114, 1120 n. 10, 71 L.Ed.2d 214 (1982).

The objectors contend that there is no need to resort to the courts in this case to settle the claims of the named plaintiffs against the CCR defendants, *i.e.*, there is no need for judicial approval. They claim that the parties can do so by contract. Instead, the objectors argue, this suit was brought by cooperating interests for the sole purpose of affecting the rights of others. The objectors find collusion in the presentation of this lawsuit as a class action. The class action form, they claim, is used solely for the purpose of "rop[ing] millions of future asbestos claimants into [the] settlement[.]" Baron Brief at 42. The objectors argue that when class actions are settled prior to filing the complaint, they are necessarily brought solely to enforce a settlement on others.

The objectors' argument on this point is without merit. As I see it, *all* class actions are brought to affect the rights of class members. "The purpose of a class action is to

dispose of the claims of numerous parties in one proceeding." *King v. South Cent. Bell Tel. & Tel. Co.,* 790 F.2d 524, 528 (6th Cir. 1986); *see also EEOC v. American Tel. & Tel. Co.,* 556 F.2d 167, 173–74 (3d Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978). It follows that class action settlements are reached for the same reason—regardless of their timing. This is precisely why Rule 23 requires judicial scrutiny of class action settlements to determine whether they are fair to the class members. Presentation of this lawsuit as a class action, therefore, is not evidence of collusion.[25]

Looking to the nature of the controversy, and not the timing of the settlement agreement, it is clear that the plaintiffs and the CCR defendants are true adversaries. The proposed settlement simply represents a compromise of a genuine dispute. *See, e.g., In re Joint E. & S. Dist. Asbestos Litig.,* 982 F.2d 721, 739 (2d Cir.1992), *modified in other respects,* 993 F.2d 7 (2d Cir.1993) (asbestos claimants and defendant companies cannot be put in same subclass because their interests are "profoundly adverse to each other."). This Court's reasoning in *Pennsylvania Ass'n for Retarded Children* does not require a contrary ruling. Just as the plaintiffs and the Commonwealth of Pennsylvania began as adversaries in that case, so did the parties to this dispute. And, the settlements in both cases were reached only after long negotiations.

I conclude that this case is one involving genuinely adverse interests, but, because of the settlement, it lacks a dispute as to the remedy. I conclude, therefore, that the simultaneous filing of the complaint and the proposed settlement does not require a conclusion that the case is collusive or lacks a genuine dispute. A contrary rule would unwisely discourage pre-litigation negotiations and, by encouraging parties to wait an "appropriate" period of time after filing suit to file a proposed settlement, elevate form over substance.

The objectors' second collusion argument is that the CCR defendants' agreement in

---

**25.** Of course, this Court will not approve the proposed settlement in this case if it is not fair to those persons the objectors purportedly seek to

protect from the settlement, *i.e.,* the absent class members.

the settlement to pay class counsel's fees is evidence that this lawsuit is "friendly." A review of class action cases, however, quickly reveals that such agreements are standard practice. *Malchman v. Davis,* 761 F.2d 893, 904 (2d Cir.1985), *cert. denied,* 475 U.S. 1143, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986); *Brown v. Pro Football, Inc.,* 1991 WL 536929, 1991 U.S. Dist. LEXIS 11854, at *9 (D.D.C.1991); *Seagoing Uniform Corp. v. Texaco, Inc.,* 1989 WL 129691, 1989 U.S. Dist. LEXIS 12579, at *1 (S.D.N.Y. Oct. 23, 1989); *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.,* 671 F.Supp. 819, 825 (D.Mass.1987); *Lurns v. Russell Corp.,* 604 F.Supp. 1335, 1345 (M.D.Ala.1984); *Dekro v. Stern Bros. & Co.,* 571 F.Supp. 97, 101 (W.D.Mo.1983). Such a provision was expressly approved by the court as "preferable and proper" in *In re A.H. Robins Co.,* 88 B.R. 755, 761 (E.D.Va.1988), *aff'd,* 880 F.2d 709 (4th Cir.1989). Because in those cases, as in this case, the *amount* of class counsel's fees is to be fixed by the court, the fee agreements do not support an allegation of collusion.

In light of the foregoing, I conclude that this case is not a collusive or "friendly" suit.

### D. Mootness

■■■■■ To satisfy the Article III case or controversy requirement, the parties must not only present a "honest and actual antagonistic assertion of rights," *Johnson,* 319 U.S. at 305, 63 S.Ct. at 1077, but the controversy must continue to exist at all stages of the federal proceedings. If events subsequent to the filing of the complaint resolve the dispute, the case should be dismissed as moot. *United States Parole Com. v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980). Generally, if the parties reach a settlement, the case is no longer justiciable as an Article III controversy. There is, however, an exception to this rule: a case does not become moot when the parties reach a *proposed* settlement that is contingent on the approval of the court. *Havens Realty Corp.,* 455 U.S. at 371 n. 10, 102 S.Ct. at 1120 n. 10; *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 465 n. 3, 98 S.Ct. 2454, 2456 n. 3, 57 L.Ed.2d 351 (1978). And, as discussed above in the context of collusion, a class action settlement requires judicial approval pursuant to Rule 23 to be binding on the class members. Thus, the objectors' first argument, that the proposed settlement moots the case, is without merit.

■■■■■ The objectors also argue, however, that certain "side agreements" between class counsel and the CCR defendants effectively settle the claims of the named or representative plaintiffs. The objectors claim that because of these side agreements, the individual claims of the named plaintiffs and the entire class action are moot.

The objectors point to the existence of certain side agreements between the CCR defendants and various law firms who represent asbestos victims, including class counsel, as requiring a finding that this lawsuit is moot. *See* Plaintiffs' Proffer on Preliminary Evaluation of Fairness (example attached as part of Exhibit 3). The agreements are an attempt by the CCR defendants to provide an alternative dispute resolution ("ADR") procedure with respect to future asbestos claims in the event that the proposed settlement in this case fails to be approved and implemented. Under the terms of the side agreements, the signatory law firms will recommend to their future asbestos clients that they defer filing suit against the CCR defendants until any asbestos-related disease is manifested. By deferring their claims, these clients would be accepting the criteria in the CCR defendants' ADR procedure which is virtually identical to the criteria in the proposed settlement. The clients are free to reject the recommendation of counsel, however, and sue the CCR defendants at any time. If the clients accept class counsel's recommendation, the statute of limitations is, by the terms of the agreement, tolled.

These side agreements superseded a prior agreement with one of the two law firms representing the plaintiff class. In the original agreement, if a future asbestos client did not wish to defer filing suit against the CCR defendants until an asbestos-related condition is manifested, the law firm could not represent him or her in a suit against the CCR defendants. However, in light of the recent opinion of the American Bar Associa-

tion Standing Committee on Ethics and Professional Responsibility (Formal Opinion 93–371), the parties changed this agreement so as to avoid a possible violation of Model Rule of Professional Conduct 5.6(b) which prohibits restrictions on a lawyer's right to practice law.

The objectors claim that these side agreements require dismissal of this class action as moot under the recent Third Circuit case of *Lusardi v. Xerox Corp.*, 975 F.2d 964, 983 (3d Cir.1992). In *Lusardi*, former employees brought an age discrimination class action case against their employer. After the case was filed and while no class certification motion was yet pending, the named plaintiffs fully and unconditionally settled their own claims against their employer. The claims of the rest of the putative class remained unsettled, and the named plaintiffs wished to reserve their right to act as class representatives. The Third Circuit held that because the named plaintiffs settled their claims before class certification, the class action was moot. *Id.* at 974. The court stated:

> In such a situation, "there is no plaintiff (either named or unnamed) who can assert a justiciable claim against any defendant and consequently there is no longer a 'case or controversy' within the meaning of Article III of the Constitution."

*Id.* (quoting *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1041 (5th Cir.1981)).

The objectors claim that, as in *Lusardi*, the named plaintiffs ·in this case have, through the existence of the side agreements, effectively settled their claims against the CCR defendants whether or not the proposed settlement is approved. Baron Brief at 45. This statement is factually untrue. The side agreements do not settle any claims with any asbestos victims. The side agreements only bind the signatory law firms, not their individual clients. Thus, in the event that the proposed settlement is not approved, the claims of the named plaintiffs are not settled. They, and all future asbestos claimants, remain free to sue the CCR defendants, and the various signatory law firms can still

represent them in their suit.[26] Therefore, *Lusardi* is inapplicable here because, unlike the named plaintiffs in that case, the named plaintiffs in this class action have not definitively settled their claims.

The objectors further claim that the obvious intent of the parties was to have class counsel agree, on behalf of all their clients (*i.e.*, the named plaintiffs), to process claims using the same criteria and procedures as those detailed in the proposed settlement in the event that the settlement is not approved. However, I find that if the claims of the named plaintiffs are not actually settled by the side agreements because these individual plaintiffs themselves are not bound by the side agreements, then the "true" intention of the parties is not important. *Cf. Parks v. Pavkovic*, 753 F.2d 1397, 1404 (7th Cir.), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3529, 87 L.Ed.2d 653 (1985) (case does not become moot because one of the parties, while continuing to take all the steps that a live adversary would take to assert his rights, has secretly concluded that come what may he will give his opponent everything the opponent seeks). In other words, whether or not the named plaintiffs have, as the objectors state, committed themselves to the *Carlough* criteria and procedures, is irrelevant if their current claims are not yet settled and thus are not moot.

I conclude, therefore, that this class action is not moot.

### III. CONCLUSION

Federal courts are under a continuing duty to satisfy themselves of their jurisdiction before proceeding to the merits of any case. Having done so here, I find that this Court has subject matter jurisdiction over this case. For the reasons discussed above, I find that this class action is a non-collusive justiciable case or controversy in which plaintiffs have standing pursuant to Article III of the Constitution. I also find that it cannot be concluded to a legal certainty that the amount in controversy for each class member does not

---

**26.** Even under the original agreement which restricted class counsel's ability to sue the CCR defendants, the individual asbestos claimants were still free to retain other counsel to represent them against the CCR defendants.

exceed $50,000 in accordance with 28 U.S.C. § 1332. Accordingly, the objections to this Court's subject matter jurisdiction are overruled.